2000 OK 3

Gary BOREN d/b/a Reliable Plumbing, Jim Utley d/b/a Jim's Service Co., Interiors of Northwest Oklahoma, an Oklahoma Corporation, Southwest Glass and Door, a Kansas Corporation, J.A.G. Construction, a Kansas Corporation, and Sparks Electric, Inc., an Oklahoma Corporation, Plaintiffs–Appellees,

and

Jim Scott d/b/a Jim Scott Painting, Plaintiff,

v.

THOMPSON & ASSOCIATES, Defendant–Appellant,

and

Russell McBee d/b/a R.J. Builders, and McBee, Inc. d/b/a Thurman Wilson Insurance, Defendants.

No. 90,437.

Supreme Court of Oklahoma.

Jan. 18, 2000.

Rick Harbison, Larry Field, Guymon, Oklahoma, For Plaintiffs/Appellees.

Daniel H. Diepenbrock, Grant C. Shellenberger, Liberal, Kansas, For Defendant/Appellant.

¶ 1 KAUGER, J.:

¶ 2 The dispositive issue presented on certiorari is whether an architectural firm may be liable to subcontractors in negligence for damages arising from its architect's certification of payments to a contractor without a required statutory payment bond being secured. Under the facts presented, it may.

## FACTS

■ ¶ 3 Pursuant to 61 O.S.1991 §§ 1[1] and 2,[2] contractors must post performance

1. Title 61 O.S.1991 § 1 provides in pertinent part:

"A. Prior to the award of any contract exceeding the amount of Seven Thousand Five Hundred Dollars ($7,500.00) for the purpose of making any public improvements or constructing or repairing any public building, the person to whom said contract is awarded shall: 1. furnish a bond with good and sufficient sureties payable to the state in a sum not less than the total sum of the contract; or 2. cause an irrevocable letter of credit containing such terms as may be prescribed by the Office of Public Affairs to be issued for the benefit of the state by a financial institution insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation in a sum not less than the total sum of the contract. The bond or irrevocable letter of credit shall ensure the proper and prompt completion of the work in accordance with the contract and shall ensure that the contractor shall pay all indebtedness incurred by said contractor, his subcontractors, and all materialmen for such labor, material, rental of machinery or equipment, and repair

of and parts for equipment as are used or consumed in the performance of said contract...."

This statute was amended in 1992, increasing the dollar amount of the contract from $7,500.00 to $13,500.00.

2. Title 61 O.S.1991 § 2 provides in pertinent part:

"Such bond shall be filed in the office of the agency, institution, department, commission, municipality or government instrumentality that is authorized by law and does enter into contracts for the construction of public improvements or buildings, or repairs to the same; and the officer with whom the bond is filed shall furnish a copy thereof to any person claiming any rights thereunder. Any person to whom there is due any sum for labor, material or repair to machinery or equipment, furnished as stated in the preceding section, his heirs or assigns, may bring an action on said bond for the recovery of said indebtedness, provided that no action shall be brought on said bond after one (1) year from the day on

and payment bonds ensuring the construction of public buildings. A performance bond protects the owner of the property by assuring completion of a project in the event of default by the general contractor and a payment bond guarantees payment to subcontractors in the event of default.[3] This cause arose because of the failure to secure a payment bond during the construction of a library building for Independent School District 53 in Tyrone, Oklahoma.

¶ 4 On September 13, 1993, the school board hired the appellant, Thompson and Associates (architectural firm), to design and oversee construction of the library.[4] Gary Gilpin (architect), an employee of the firm, served as the architect and project manager. Besides designing the building, the firm advertised, initiated the bidding process, and prepared the project specifications used to obtain bids from contractors. The specifications for the library included a notice to all interested parties that the successful bidder was required to provide both a performance

and a payment bond for the project.[5] The instructions to bidders required that the bonds be delivered to the school board within three days of the execution of the contract.[6]

¶ 5 The initial bids exceeded the school's budget. Thereafter, modifications were made to the plans and the bids were resubmitted. On June 29, 1994, the school board awarded the contract to Russell McBee (contractor). The contract mandated a substantial completion by December 1, 1994. After the award, the contractor contracted with each of the appellees, subcontractors, to provide materials and/or labor for construction of the library.[7]

¶ 6 Although the contractor supplied the required performance bond, a payment bond was not secured.[8] Work began on the project sometime in August of 1994. Under the contract between the architectural firm and the school board, the firm's architect certified payments to the contractor as construction proceeded.[9] Pursuant to the General Condi-

---

which the last of the labor was performed or material or parts furnished for which such claim is made...."
This statute was amended in 1995 and 1997, however, the pertinent parts remain substantially the same.

**3.** *Kammer Asphalt Paving Co., Inc., v. East China Township Schools*, 443 Mich. 176, 504 N.W.2d 635 (1993).

**4.** Transcript of jury trial testimony of School Superintendent Gerald Miller, September 17, 1997, providing in pertinent part at p. 19:

"... Q Mr. Miller as you understood it, what did you hire Thompson and Associates to do? A Since neither I or the board members were familiar with this we were hoping to hire an architect that would oversee the entire project...."

**5.** Plaintiff's exhibit # 2, Specifications for the Construction of Tyrone School Library, provides in pertinent part at p. A–2:

"... The successful bidder shall be required to provide a performance and payment bond in accordance with Instruction to Bidders, AIA 701–1987 and General Conditions for Construction, AIA 201–1987 (both documents included in the specifications)...."

**6.** Plaintiff's exhibit # 2, Specifications for the Construction of Tyrone School Library, AIA Document A701 Instructions to Bidders Art. 7, § 7.2.1 provides in pertinent part:

"The Bidder shall deliver the required bonds to the Owner not later than three days following the date of execution of the Contract...."

**7.** The plaintiff Jim Scott originally joined in this action but dismissed his claims against the defendants prior to trial.

**8.** At trial, the contractor testified that he thought he had paid for and secured both a performance and a payment bond from a bonding company. He insists that he went to his insurance agency to secure a bidding bond and inquire about obtaining a performance bond and a payment bond. His insurance agent referred him to a bonding company from a flier she had received in the mail. After talking with the bonding company and paying a premium, he assumed he had secured a performance and payment bond for the project. When the documents arrived he forwarded them to the architect without checking them to see if he had both bonds. He also insists that the architect had spoken with the bonding company to ensure that everything was in order. The record reveals a performance bond dated July 10, 1994, but no payment bond.

**9.** Plaintiff's exhibit # 1, Standard Form Agreement Between Owner and Architect provides at Art. 2 § 2.6.9:

"Based on the Architect's observations and evaluations of the Contractor's Application for Payment, the Architect shall review and certify the amounts due the contractor."
Art. 2 § 2.6.10 provides in pertinent part:

tions of the Contract for Construction, the architect had the authority to withhold certification if the contractor failed to pay the subcontractors.[10] Nevertheless, payments were certified without evidence of a bond. Although the architect sent a note to the contractor dated August 3, 1994, reminding him of the required performance and payment bonds for the project,[11] the architect received only a copy of the performance bond. Apparently, the architect simply assumed the packet included a payment bond and he filed the paperwork.

¶ 7 In December of 1994, a lawyer contacted the architect on behalf of a subcontractor, Page Construction. The lawyer informed the architect of a dispute with the contractor regarding payment and requested a copy of the payment bond. It is at this juncture that the architect insists that he discovered that he did not have a copy of a payment bond in his file.[12] Although the architect did withhold certification to the contractor until the dispute with Page Construction was resolved, he resumed certifying payments to the contractor on January 27, 1995, with knowledge that no bond existed. The architect became aware that other subcontractors were not being paid when he started receiving claims from them in May and June of 1995.[13]

¶ 8 On November 29, 1995, the subcontractors filed suit against the architectural firm alleging negligence in certifying payments to the contractor in absence of the statutorily required payment bond.[14] The architectural firm filed a motion to dismiss on December

---

"... However, the issuance of a Certificate for Payment shall not be a representation that the Architect has ... (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment or (4) ascertained how or for what purpose the Contractor has used money previously paid on account of the Contract sum."

10. Plaintiff's exhibit # 2, Specifications for the Construction of Tyrone School Library, AIA Document A201 General Conditions of the Contract for Construction Art. 9, § 9.5.1 provides in pertinent part:

"The Architect may decide not to certify payment and may withhold a Certificate for Payment in whole or in part, to the extent reasonably necessary to protect the Owner, if in the Architect's opinion the representations to the Owner required by Subparagraph 9.4.2 cannot be made.... The Architect may also decide not to certify payment or, because of subsequently discovered evidence or subsequent observations, may nullify the whole or part of a Certificate for Payment previously issued, to such extent as may be necessary in the Architect's opinion to protect the Owner from loss because of:

...

.2 third party claims filed or reasonable evidence indicating probable filing of such claims;

3. failure of the Contractor to make payments properly to Subcontractors for labor, materials, or equipment;

...

.7 persistent failure to carry out the Work in accordance with the Contract Documents."

11. Plaintiff's exhibit # 5, a note from the architect to the contractor, provides in pertinent part:

"Russ,

Just a reminder of a couple of things we need to do prior to getting the subject project flying toward completion.

1) You need to provide <u>Performance and Payment Bonds</u>. If you have already given these to Jerry Miller let me know and I'll review them at his office...."

12. Plaintiff's exhibit # 15, a note from the architect to the lawyer provides in pertinent part:

": .. Re: Your telephone call late afternoon 12/12/94 regarding Tyrone Library
You are correct and I just noticed we do not have in file the Payment Portion of the required Payment and Performance Bond. I am contacting contractor to provide as soon as possible. Upon receipt I will fax a copy to your office...."

13. The contractor did not pay the subcontractors for their labor and/or materials. Ultimately, the contractor pled guilty to obtaining money by false pretenses based on actions relating to this project and other jobs.

14. On February 1, 1996, the trial court denied the firm's motion to dismiss. The subcontractors' amended their petition on December 17, 1996, to include the general contractor and his insurance agent as defendants. The amended petition alleged that: 1) the general contractor had been paid by the school district for the work performed by the subcontractors and that he held the fund in trust for them; and 2) the insurance agent was negligent in failing to procure the payment bond and that the subcontractors' were third party beneficiaries of the contract between the contractor and the insurance agent. On July 29, 1997, the subcontractors' dismissed their claims as third party beneficiaries to any contract between the contractor and his insurance agent.

28, 1995. It argued that the subcontractors failed to state a claim for which relief could be granted because: 1) it did not owe the subcontractors a duty; 2) no privity of contract existed between the architectural firm and the subcontractors; and 3) the subcontractors had constructive knowledge of the contractor's duty to procure the bonds making the proximate cause of the loss their own negligence. The trial court denied the firm's motion to dismiss.

¶ 9 A three day jury trial was conducted in September of 1997. During the trial, the architectural firm demurred to the subcontractor's evidence. At the close of all of the evidence, it moved for a directed verdict. The trial court overruled both of the motions and submitted the cause to the jury. The jury found in favor of the subcontractors and against the architectural firm.[15] It also returned a special verdict finding that the firm's architect had acted wilfully and with reckless disregard for the rights of the subcontractors. The subcontractors were awarded $38,525.48 in actual damages.

¶ 10 When the cause was presented for a determination of punitive damages, the subcontractors complained that the architectural firm had failed to provide the financial information they had requested in discovery. As sanctions, the trial court entered a directed verdict for punitive damages in the amount of actual damages, and the architectural firm appealed. The Court of Civil Appeals reversed and remanded finding that the proximate cause of the subcontractor's loss was their failure to ensure the statutory bond had been obtained before furnishing material or commencing work. We granted certiorari on September 27, 1999.

¶ 11 THE ARCHITECTURAL FIRM'S MOTION TO DISMISS WAS PROPERLY DENIED UNDER THE FACTS PRESENTED. THE SUBCONTRACTORS STATED A CLAIM OF NEGLIGENCE AGAINST THE ARCHITECTURAL FIRM. *HASKELL LEMON CONST. CO. v. INDEPENDENT SCHOOL DIST NO. 12 OF EDMOND* AND ITS PREDECESSORS ARE NOT DISPOSITIVE OF THE SUBCONTRACTOR'S CLAIMS AGAINST THE ARCHITECTURAL FIRM.

¶ 12 The architectural firm asserts that the trial court erred in denying its motion to dismiss and that this cause should not have proceeded to trial. It argues that: 1) pursuant to 12 O.S.1991 § 2012(B)(6),[16] the subcontractor's petition failed to state a claim because it owed no duty to the subcontractors; and 2) no privity of contract exists to support a tort action. Alternatively, the architectural firm seeks the same protection afforded a public official under *Haskell Lemon Const. Co., v. Independent School Dist. No. 12 of Edmond,* 1979 OK 5, 589 P.2d 677. *Haskell* holds that public officials are not liable to subcontractors for the failure to secure a statutory payment bond because the proximate cause of loss is their negligence in failing to ascertain the existence of the bonds.

¶ 13 The subcontractors concede that they are not in privity of contract with the architectural firm. Rather they argue that a contractual relationship is not required under the facts of this case, and that the firm's architect had a duty to avoid foreseeable harm to the subcontractors. To support their assertions they point to the architect's obligation to certify payment's to the contractor, the architect's authority to withhold payment, the statutory requirement of a payment bond, and the architect's actions when he knew or should have known that there was no payment bond. We granted certiorari to revisit *Haskell*'s rationale, and to address its application to a private, for-profit company engaged in the business of design-

---

**15.** The jury also found in favor of the subcontractors against the contractor, but found no liability from his insurance agent.

**16.** Title 12 O.S.1991 § 2012(B).

ing and overseeing public construction projects.

¶ 14 In *Haskell Lemon Const. Co. v. Independent School Dist. No. 12 of Edmond,* supra, a subcontractor brought an action against a school district and individual school board members for materials furnished to a contractor on a public works project. The school district did not check to see that the contractor had obtained the required statutory payment bond. Consistent with a line of cases beginning in 1916,[17] the *Haskell* Court did not impose liability on the public entity or the individual school board members for any losses caused by the failure of the contractor to obtain the bond.

¶ 15 The *Haskell* Court recognized that: 1) the bond statutes were enacted by the Legislature as a matter of public policy to protect laborers and materialmen on public construction projects in the event of default of the contractor; 2) regardless of whether the responsible public official fails to ensure that a bond is secured, unpaid laborers and materialmen may not look to or collect from the public entity; and 3) a subcontractor is charged with knowledge of the statutory duty of the contractor to obtain a bond. The Court also stated that a subcontractor furnishing materials or performing work before a bond is secured cannot recover from a public agency because "the proximate cause of the loss was his own negligence in not ascertaining whether a bond had been given."

■ ¶ 16 *Haskell* and its predecessors[18] stand for the proposition that regardless of whom bears the burden of ensuring that the statutorily required bond is in place, a public entity or its officers may not be held liable for the failure to secure the bond.[19] However, the fundamental objective of the bond statutes is twofold—protecting laborers and materialmen on public construction projects who have no lien rights against public land or improvements, and saving the public from all liability for liens for material and labor furnished on public improvements.[20]

■ ¶ 17 The purpose of bonding statutes would not be served by protecting a private, for-profit company engaged in the business of designing and overseeing public construction projects from potential liability. The gravamen of the architectural firm's argument is that it had no duty, as a matter of law, to see that the contractor obtained the statutorily required payment bond. We agree that the contractor has a statutory duty to secure a payment bond. However, the architectural firm misconceives the issue. Here, the damages arose from the architect's negligence in failing to ascertain that there was no payment bond and in making unauthorized payments to the contractor after he discovered that no payment bond existed. Damages which would not have arisen had the bond been obtained.

■ ¶ 18 Had this been a private building project an architect's withholding of payment to a contractor would, in addition to protecting an owner from paying for work not performed and material not delivered, protect an owner from the filing of materialmen liens and would protect subcontractors

---

17. See, *Electric Supply Co. v. City of Muskogee,* 1935 OK 235, 171 Okla. 130, 42 P.2d 140; *Frensley Bros. Lumber Co. v. Scott,* 1926 OK 312, 117 Okla. 133, 245 P. 615; *Tulsa Boiler M.F.G. Co. v. Shaffer,* 1919 OK 117, 72 Okla. 235, 180 P. 379; *Reinhart & Donovan Co. v. Board of Comr's of Choctow Co.,* 1918 OK 327, 70 Okla. 127, 173 P. 848; *Clark v. Board of Comr's of Osage Co.,* 1916 OK 1002, 62 Okla. 7, 161 P. 791; *Bushnell v. Haynes,* 1916 OK 359, 156 P. 343. See also, *American Cas. Co. v. Board of Educ. of Ind. School Dist. No. 2,* 228 F.Supp. 843 (W.D.Okla. 1964); *American Cas. Co. v. Town of Shattuck,* 228 F.Supp. 834 (W.D.Okla.1964).

18. *Id.*

19. Although other state legislatures have expressly placed liability on the contracting governmental entity for breach of a duty to obtain an adequate payment bond from a contractor, see generally, G. Powell, Jr., Annot., "State or Local Government's Liability to Subcontractors, Laborers, or Materialmen for Failure to Require General Contractor to Post Bond," 54 A.L.R.5th 649 (1998), our Legislature has not. Title 61 O.S. 1991 § 1, see note 1 supra; Title 61 O.S.1991 § 2, see note 2, supra.

20. See, *Richards & Conover Steel v. Nielsons,* 1988 OK 48, ¶ 14, 755 P.2d 644; *Haskell Lemon Const. Co. v. Independent School Dist. No. 12 of Edmond,* 1979 OK 5, ¶ 7, 589 P.2d 677; *Lohr & Trapnell v. H.W. Johns–Manville Co.,* 1919 OK 309, 77 Okla. 6, 185 P. 526.

by ensuring payment.[21] Here, the purpose is the same except where public works projects are concerned, subcontractors are protected by bonds because public property cannot be encumbered by liens. Payment bond statutes which require bonds for public work projects are specifically provided for the benefit of subcontractors.[22] Concurrent with a contractor's duty to secure a bond is the public entities' duty to withhold payment to a contractor in the absence of a bond.[23]

■ ¶ 19 We recognize that an architect is not a guarantor, nor may architects ordinarily be responsible for supervising a contractor's disbursements to subcontractors.[24] Nevertheless, once a public entity has contracted with a private party to oversee a construction project, subcontractors should be able to assume that the private party responsible for certifying payments has verified the existence of the bonds. To do otherwise, would thwart the purpose and intent of the bond statutes.[25] Although we are unaware of any authority previously existing which holds an architectural firm liable to subcontractor's in negligence for damages arising from its architect's certification of payments to a contractor without the required statutory bond being secured,[26] the scenario is not unlike those cases which have recognized an architect's liability to a surety or a contractor for losses caused by the architect's negligent performance of a contractual obligation with the owner.

¶ 20 In *Designed Ventures, Inc., v. Housing Authority of the City of Newport*, 132 B.R. 677 (Bankr.D.R.I.1991), the court considered whether an architect hired by an owner to oversee the general contractor's performance could be liable for negligently releasing progress payments to the contractor to the detriment of a third party surety on a performance bond. After the contractor defaulted, the surety alleged that the architect was liable for damages because the architect negligently paid the contractor when the architect knew or should have known that the contractor was behind schedule and in default of payments to subcontractors and suppliers. The court recognized that the basis for the negligence action, notwithstanding the absence of privity, was a common-law duty which existed between the architect and the surety.

¶ 21 The *Ventures* court applied the reasoning of *Forte Bros., Inc. v. National Amusements, Inc.*, 525 A.2d 1301 (R.I.1987), a decision of the Rhode Island Supreme Court. In *Forte*, the court held that a third party contractor which may have foreseeably been injured or suffered economic losses proximately caused by the negligent perfor-

21. See discussion note 23, infra.

22. Title 61 O.S.1991 § 1, see note 1, supra; Title 61 O.S.1991 § 2, see note 2, supra.

23. See, *Stroud Oil Reclaiming Co. v. Community State Bank*, 1970 OK 196, ¶ 16, 475 P.2d 819 [Recognizing governmental obligation and moral duty to protect laborers and materialmen dealing with a reckless contractor constructing a public work project.]; *Tulsa Boiler Mfg. Co. v. Shaffer*, see note 17, supra, quoting *Bushnell v. Haynes*, see note 17, supra ["Until such bond has been given no duty rests upon the contractor to proceed with the execution of his part of the contract, and if he does proceed under the contract without having given the bond, his claim for services should not be allowed. No other interpretation of the statute under consideration will give effect to its purpose, which is to fully indemnify against loss those who deal with public improvement contractor as those who deal with other contractor with private persons are indemnified by the provisions of the mechanics and materialmen's lien laws."].

24. A contract for construction could call for submission of paid invoices or receipts which would change the factual situation in regard to the architect's responsibility.

25. See generally, J. Mercier, "Little Miller Acts: Liability of Public Owners for Failure to Obtain Payment on Public Construction Projects," 14 OCT Construction Law 7, (1994)[Recognizing that labor and materials are often committed and then supplied prior to the time the bonds are provided.].

26. But see, *Cullum Mechanical Constr. Co. v. S.C. Baptist Hosp.*, 336 S.C. 423, 520 S.E.2d 809 (S.C.App.1999) [Addressing an architect's negligence in failing to ascertain the existence of a bond and certifying payments to contractor, the Court found no duty of the architect to a subcontractor based on the contractual obligations the architect owed to the owner and general contractor beyond the professional duty to design and supervise construction with due care.]. See also, generally, W. Shipley, Annotation, "Liability of Architect or Engineer for Improper Issuance of Certificate," 43 A.L.R.2d 1227 (1955).

mance of a contractual duty by the architect could maintain a negligence action without direct privity of contract between the parties. The *Forte* court stated:

> "A supervising architect, in the performance of its contract with the owner, is required to exercise the ability, skill and care customarily exercised by architects in similar circumstances. This duty of care extends to contractors who share an economic relationship and community of interest on a construction project. The duty is based on circumstances establishing a direct and reasonable reliance by the contractor on the contractual performance of the architect when the architect knows or should know, of that reliance." (Citations omitted.)

¶ 22 We find *Ventures* and *Forte*, to be persuasive.[27] At common law, privity of contract was required before a tort action could arise from a breach of duty created by contract—i.e. limiting liability to contracting parties.[28] However, liability for negligent breach of contract is not necessarily dependent upon a pre-existing privity in legal relationship between the person injured and the person causing the injury.[29] As we recognized in *Keel v. Titan Const. Corp.*, 1981 OK 148, 639 P.2d 1228, an architect's liability is based upon proximate cause and the foreseeability that his conduct could harm third parties.[30] Although we do not attempt to, or deem it necessary to exhaustively list them, many jurisdictions recognize that the general rule, rather than the exception, is that privity of contract, under many circumstances, is no longer a bar to a negligence action against an architect.[31]

¶ 23 Architects are required to exercise ordinary professional skill and diligence in rendering their professional services.[32] Whenever the circumstances attend-

---

**27.** Other courts have reached similar results. *Aetna Ins. Co. v. Hellmuth, Obata & Kassabaum*, 392 F.2d 472, 475 (8th Cir.1968) [A surety may recover for loss occasioned by an architect's negligence in failing to properly supervise construction project where architect was obligated by contract to supervise construction, regardless of lack of privity between surety and architect.]; *Peerless Ins. Co. v. Cerny & Assoc.*, 199 F.Supp. 951, 955 (D.Minn.1961); *Davidson & Jones, Inc., County of New Hanover*, 41 N.C.App. 661, 255 S.E.2d 580 (1979) [An architect, in the absence of privity of contract, may be sued by general contractor or subcontractors working on a construction project for economic loss foreseeably resulting from breach of architect's common-law duty of care in the performance of his contract with the owner.]. See also, *Sweeney Co. of Maryland v. Engineers–Constructors, Inc.*, 823 F.2d 805, 808 (4th Cir.1987) [The certification of progress payments cannot be viewed as a rubber-stamp process, without creating exposure to negligence claims.]. However, other courts disagree, see generally, F. Wagner, Annotation, "Tort Liability of Project Architect for Economic Damages Suffered by Contractor," 65 A.L.R.3d 249 (1975).

**28.** See, *Waggoner v. W & W Steel Co.*, 1982 OK 141, ¶ 7, 657 P.2d 147; *Truitt v. Diggs*, 1980 OK 57, ¶ 13, 611 P.2d 633.

**29.** *Keel v. Titan Const. Corp.*, 1981 OK 148, ¶ 14, 639 P.2d 1228.

**30.** *Keel v. Titan Const. Corp.* see note 29, supra. [Privity had no application when a third-party home owner alleged architect's liability for negligent design of a solar energy system based upon the architect's breach of a contract between the

architect and a general contractor. The question of liability becomes one of proximate cause and foreseeability.] See also, *Waggoner v. W & W Steel Co.*, see note 28, supra [It is possible for an architect to be liable for injuries received by a person with whom there is no privity, but there can be no standard rule; determination must be made by considering the nature of the architect's undertaking and his conduct.]; *Truitt v. Diggs*, see note 28, supra [Recognizing that the restriction of privity has generally been eliminated or modified in cases involving the liability of architects for physical injury or death to third persons from improper plans or designs.].

**31.** See generally, D. Zupanec, Annot., "Architect's Liability for Personal Injury or Death Allegedly Caused by Improper Plans or Design," 97 A.L.R.3d 455 (1980); F. Wagner, Annot., "Liability to One Injured in Course of Construction, Based upon Architect's Alleged Failure to Carry Out Supervisory Responsibilities," 59 A.L.R.3d, 869 (1974); J. Nischwitz, Note, "The Crumbling Tower of Architectural Immunity: Evolution and Expansion of Liability to Third Parties," 45 Ohio St. L.J. 217 (1984); A. Earley, Note, "Liability of Architects and Engineers to Third Parties: An New Approach," 53 Notre Dame L.Rev. 306 (1977); See also, *St. Paul Fire & Marine Ins. Co., v. Getty Oil Co.*, 1989 OK 139, 782 P.2d 915 [Recognizing that under the modern rule privity is no longer applied to design and construction cases.].

**32.** See, *Waggoner v. W & W Steel Co.*, see note 28, supra. *Wills v. Black & West, Architects*, 1959 OK 162, ¶ 12, 344 P.2d 581; *Smith v. Goff*, 1958 OK 100, ¶ 7, 325 P.2d 1061.

ing a situation are such that an ordinarily prudent person could reasonably see that, as the natural and probable consequences of the act, another person will be in danger of receiving an injury, a duty to exercise ordinary care to prevent such injury arises.[33] Under the facts presented, we have no doubt that the architect ought to labor under a duty to subcontractors to refrain from paying the contractor without the required statutory payment bond being secured. Here, the firm's architect was contractually obligated to certify payments to the contractor; the architect was aware of the statutory payment bond requirement; the architect had the authority to withhold payments when he was aware or should have been aware that the contract was awarded without the bond being secured; and the architect continued to authorize payments after he had acknowledged that no bond was in place. If the architect knew or should have known that the contractor was not paying bills for material and/or labor on work already performed and on which the contractor had already been reimbursed, then the architect had a duty to make inquiry and take steps to correct the situation before making further certification on work performed.

¶ 24 To the extent that the bond statutes protect public entities and do not expressly impose liability on public entities or their officers, we affirm the teachings of *Haskell* and its progeny. We reiterate that a subcontractor is charged with knowledge of the statutory duty of the contractor to provide a bond. We agree that a jury may consider the subcontractors neglect in failing to personally verify whether a payment bond has been secured.[34] Nevertheless, a subcontractor should not be precluded in all circumstances from asserting a claim against an entity such as the firm solely because it did not request a copy of the bond. To the extent *Haskell* and its predecessors [35] are inconsistent with this opinion, they are overruled. Under the facts presented, the architectural firm's motion to dismiss was properly denied.

## CONCLUSION

¶ 25 Dismissal for failure to state a claim upon which relief can be granted involves a de novo consideration of whether the petition is legally sufficient.[36] When reviewing a motion to dismiss, all of the challenged pleading's allegations together with reasonable inferences which may be drawn from them are taken in favor of the nonmoving party.[37] The appropriate question in testing the sufficiency of the allegations is whether relief is possible under any set of facts that could be established consistent with the allegations.[38] Courts may recognize a cause of action where they conclude that a defendant owes a duty of care to the plaintiff.[39] Under the facts presented, the architect had a duty to the subcontractors to

**33.** *Union Bank of Tucson, Arizona v. Griffin,* 1989 OK 47, ¶ 13, 771 P.2d 219; *Bradford Securities v. Plaza Bank & Trust,* 1982 OK 96, ¶ 6, 653 P.2d 188; *Keel v. Titan Const. Corp.,* see note 29, supra.

**34.** *Haskell Lemon Const. Co., v. Independent School Dist. No. 12 of Edmond,* see note 20, supra, was decided in January of 1979. On July 1, 1979, Oklahoma's comparative negligence statute 23 O.S.1991 § 13 first became operative, which no longer bars a plaintiff from recovery if the plaintiff is partially at fault.

**35.** *Electric Supply Co. v. City of Muskogee,* see note 17, supra; *Frensley Bros. Lumber Co. v. Scott,* see note 17, supra; *Tulsa Boiler Mfg. Co. v. Shaffer,* see note 17, supra; *Reinhart & Donovan Co. v. Board of Com'rs of Chocotow Co.,* see note 17, supra; *Clark v. Board of Com'rs of Osage Co.,* see note 17, supra; *Bushnell v. Haynes,* see note 17, supra; See also, *American Cas. Co. v. Board of Educ. of Ind. School Dist. No. 2,* note 17,

supra; *American Cas. Co. v. Town of Shattuck,* note 17, supra.

**36.** *Estes v. Estes,* 1996 OK 79, ¶ 13, 921 P.2d 346; *Washington v. State ex rel. Dept. of Corrections,* 1996 OK 139, ¶ 7, 915 P.2d 359; *Indiana Nat. Bank v. D.H.S.,* 1994 OK 98, ¶ 3, 880 P.2d 371.

**37.** *Lockhart v. Loosen,* 1997 OK 103, ¶ 4, 943 P.2d 1074; *Indiana Nat. Bank v. D.H.S.,* see note 36, supra; *Independent School Dist. No. 9 of Tulsa Co. v. Glass,* 1982 OK 2, ¶ 10, 639 P.2d 1233.

**38.** *Gaylord Entertainment Co. v. Thompson,* 1998 OK 30, ¶ 8, 958 P.2d 128; *Lockhart v. Loosen,* see note 37, supra; *Indiana National Bank v. D.H.S.,* see note 36, supra.

**39.** *Mansfield v. Circle K. Corp.,* 1994 OK 80, ¶ 6, 877 P.2d 1130; *Busby v. Quail Creek Golf & Country Club,* 1994 OK 63, ¶ 6, 885 P.2d 1326.

refrain from paying the contractor without the required statutory payment bond being secured.

¶ 26 We do not affirm the trial court judgment. Instead we remand the cause to the Court of Civil Appeals. Rule 1.180(b) of the Oklahoma Supreme Court Rules, 12 O.S. 1991 Ch. 15, App. 1,[40] provides that should we vacate an opinion of the Court of Civil Appeals, we may address the matters not decided or remand for determination of issues left unresolved by the Court of Civil Appeals's decision. The Court of Civil Appeals, held that *Haskell Lemon Const. Co. v. Independent School Dist. No. 12 of Edmond*, supra, was dispositive of the subcontractor's claim. In doing so, it did not visit the other issues that the firm challenged on appeal. In addition to the dismissal issue, the firm alleges errors relating to the trial court's denial of its demurrer to the subcontractors' evidence and motion for directed verdict, various jury instructions, and the trial court's award of punitive damages. Consequently, we exercise our discretion to remand the cause to the Court of Civil Appeals, to address the firm's assignments of error left unresolved. We express no view as to the merits of the unresolved issues.

CERTIORARI PREVIOUSLY GRANTED; COURT OF CIVIL APPEALS OPINION VACATED AND MATTER REMANDED TO COURT OF CIVIL APPEALS FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.

SUMMERS, C.J., HARGRAVE, V.C.J., HODGES, LAVENDER, WATT, and BOUDREAU, JJ., concur.

OPALA, J., concurs in result.

---

**40.** Rule 1.180(b), Supreme Court Rules, 12 O.S. 1991 Ch. 15, App. 1, provides:

"**Review of Certiorari.** Issues not presented in the petition for certiorari may not be considered by the Supreme Court. Provided, however, if the Court of Civil Appeals did not decide all of the properly preserved and briefed issues, the Supreme Court may—should it vacate the opinion of the Court of Civil Appeals— address such undecided matters or it may remand the cause to the Court of Civil Appeals for that Court to address such issues. The case will then be decided on the reviewable issue or issues presented in the briefs therefore filed, unless for good cause the filing of additional briefs be then allowed. The Supreme Court may—should it vacate the opinion of the Court of Civil Appeals—address any issue properly raised in the appeal or on certiorari. *Hough v. Leonard*, 867 P.2d 438 (Okla.1993)."