2004 OK CIV APP 45

**HYDRO TURF, INC., an Oklahoma corporation, Plaintiff/Appellee,**

v.

**INTERNATIONAL FIDELITY INSURANCE COMPANY, a New Jersey corporation, Defendant/Appellant,**

**Bryan Adair Construction Company, an Oklahoma Corporation, Defendant.**

**No. 99,612.**

Court of Civil Appeals of Oklahoma, Division No. 3.

April 16, 2004.

668

Craig A. Fitzgerald, Bryant Law Firm, P.L.L.C., Tulsa, OK, for Plaintiff/Appellee.

Mary Robertson, Christopher R. Graves, John H. Sparks, Crowe & Dunlevy, Norman, OK, and Kayci B. Hughes, Tulsa, OK, for Defendant/Appellant, Crowe & Dunlevy, International Fidelity Insurance Company.

Opinion by BAY MITCHELL, Presiding Judge.

¶ 1 This dispute arises out of construction contracts related to the excavation portion of the South Loop of the Creek Nation Turnpike in Broken Arrow, Oklahoma ("the Project"). Upon default by the original contractor, Defendant/Appellant International Fidelity Insurance Company ("IFIC") hired Defendant Bryan Adair Construction Company ("BACC") to complete the Project. Although IFIC secured the *original* contractor's performance by issuing performance, payment, and maintenance bonds as required by 61 O.S.2001 §§ 1 and 2, IFIC did not issue such bonds on BACC's behalf and did not require BACC to obtain the bonds on its own. BACC subcontracted with Plaintiff/Appellee Hydro Turf, Inc., to undertake seeding, mulching, fertilizing, and mowing services required for the Project. When BACC failed to pay Hydro Turf for its work, Hydro Turf sued IFIC and BACC alleging IFIC negligently failed to secure a payment bond on behalf of BACC or require BACC to do so. Hydro Turf further charged IFIC had been unjustly enriched as a result of Hydro Turf's work and Hydro Turf was entitled to prejudgment interest on the amount owed. The trial court granted Hydro Turf's motion for summary judgment against IFIC and denied IFIC's cross motion [1]. We reverse and remand for trial on the merits.

## Facts

¶ 2 On February 18, 1999, Oklahoma Turnpike Authority ("OTA") entered into Contract 1335 with Oklahoma Excavation, Inc. ("OEI"), under which OEI agreed to act as contractor and furnish certain materials and labor required to complete construction of the excavation portion of the Project. Consistent with the mandates of 61 O.S.2001 §§ 1 and 2, OEI posted performance, payment, and maintenance bonds in favor of OTA as obligee, with OEI as principal and IFIC as surety. When OEI defaulted in its performance, IFIC was required to fulfill its performance-bond obligation to OTA. In so doing, IFIC entered into a Completion Contract with BACC on December 20, 2000, under which BACC agreed to furnish the materials and labor necessary to complete the work required by Contract 1335.

¶ 3 The Completion Contract obligates BACC to fully perform and complete the Project work as if it were the original contractor under Contract 1335. The Completion Contract further provides that "[p]rior to commencing work under this Agreement, the Completion Contractor [BACC], as principal, *shall* deliver to Surety [IFIC], as obligee, a Performance Bond, a Statutory and Payment Bond and a Maintenance Bond ...." (emphasis added). Despite this provision, IFIC permitted BACC to commence work on the Project without securing the required bonds. Several months later, IFIC and BACC amended the Completion Contract to increase from five to ten percent the amount IFIC would retain from each partial payment it made to BACC after the Project was fifty percent complete.[2] IFIC supervised BACC's performance, reviewed its invoices, and approved payments to BACC. It was not until October 18, 2001, that IFIC learned BACC was failing to pay its subcontractors. IFIC holds no monies due and owing BACC.

¶ 4 Contract 1335 required OEI to seed all the areas it disturbed and establish initial grass growth. It further obligated OEI to preserve all public and private property and, at its own expense, to repair and restore any and all damaged areas to a condition similar

---

1. The order appealed does not dispose of Hydro Turf's claim against BACC. Nevertheless, pursuant to 12 O.S. § 994, the trial court expressly determined there was no just reason for delay and this should be a final order as to IFIC.

2. Under the original Completion Contract, IFIC would retain ten percent of each partial payment but only until the project was fifty percent complete. After that, IFIC would retain five percent of each partial payment to BACC. IFIC would pay the retainage to BACC as part of the final payment.

or equal to that existing before the damage or injury, and to make good on all losses to any portion of the project. BACC assumed these obligations under the terms of its Completion Contract with IFIC.

¶5 On April 10, 2001, BACC entered a Standard Subcontract Agreement with Hydro Turf under which Hydro Turf agreed to perform, and BACC to pay for, the seeding, mulching, fertilizing, and mowing required by Contract 1335. The subcontract set the maximum amount Hydro Turf could charge for seeding, mulching, fertilizing, and mowing at $87,800. Hydro Turf's invoices to BACC for the Contract 1335 work show the value of the work to be $57,758.05. Consistent with its obligations under Contract 1335, BACC asked Hydro Turf to restore approximately 40 additional acres that had been damaged or disturbed. BACC provided written authorization to Hydro Turf to perform this necessary "additional or extra work" at the rate set forth in the subcontract. Hydro Turf's invoices to BACC for the extra work under the subcontract show its value to be $30,265.45. Accordingly, the total value of the work Hydro Turf performed for BACC is $88,023.50. BACC paid Hydro Turf $20,127.50 of that amount, leaving $67,896.00 unpaid.

¶6 Although Hydro Turf fully performed all of its contractual obligations, BACC failed to pay Hydro Turf for its work. IFIC denied responsibility for payment. Hydro Turf filed suit for breach of contract and unjust enrichment seeking to recover $79,639.75 from BACC. Hydro Turf further sought $67,896 from IFIC under negligence and unjust enrichment theories, claiming IFIC was negligent in failing to secure or cause BACC to secure a statutorily-required bond guaranteeing payment to subcontractors and suppliers. IFIC contends it owes no duty to Hydro Turf, and Hydro Turf, as a matter of law, has no claim against IFIC. Additionally, if a duty is found to exist, IFIC contends disputed fact issues exist precluding summary judgment. For purposes of summary judgment, IFIC admits $67,896 is the outstanding amount not paid to Hydro Turf.

¶7 Upon cross-motions for summary judgment between Hydro Turf and IFIC, the trial court ruled in favor of Hydro Turf in the amount of $67,896 on the grounds that under *Boren v. Thompson & Assocs.*, 2000 OK 3, 999 P.2d 438, IFIC breached its duty to require BACC to post a bond to cover the cost of the materials and labor supplied by subcontractors. The trial court further found IFIC liable to Hydro Turf under an unjust enrichment theory and awarded it prejudgment interest.

### Standard of Review

¶8 IFIC contends the trial court erred in granting summary judgment to Hydro Turf. We will affirm the trial court's grant of summary judgment if no genuine controversy exists as to any material fact and the movant is entitled to judgment as a matter of law. 12 O.S.2001, Ch. 2, App.1, Rule 13. If a legitimate dispute does exist as to a material fact, however, or if reasonable minds could draw different conclusions from the undisputed facts, summary judgment is not appropriate. *Brown v. Prudential Properties of Oklahoma*, 1999 OK 7, ¶7, 976 P.2d 1043, 1045. In evaluating the trial court's grant of summary judgment on appeal, we must view the evidence in the light most favorable to the nonmovant. *Vance v. Fed. Nat'l Mtg. Ass'n*, 1999 OK 73, ¶6, 988 P.2d 1275, 1278. Of course, the question of whether a duty exists from IFIC to Hydro Turf and whether Hydro Turf has a legally recognizable claim against IFIC are questions of law, reviewable *de novo*.

### Analysis and Review

¶9 Section 1 of Title 61 provides in pertinent part:

A. Prior to an award of a contract exceeding Twenty-five Thousand Dollars ($25,000.00) for construction or repair of a public building or structure, or improvement to real property, the person that receives the award shall:

1. Furnish a bond with good and sufficient sureties payable to the state in a sum not less that the total sum of the contract;

. . .

B. The bond ... shall ensure the proper and prompt completion of the work in accordance with the contract and shall en-

sure that the contractor shall pay all indebtedness the contractor incurs for the contractor's subcontractors and all suppliers of labor, material, rental of machinery or equipment, and repair of and parts for equipment the contract requires the contractor to furnish.

Section 2 of Title 61 specifies the manner in which contractors are to file bonds and establishes subcontractors' rights of action thereupon.

¶ 10 In *Boren v. Thompson & Assocs.*, 2000 OK 3, 999 P.2d 438, a school board hired an architecture firm to design and oversee construction of a new library building. The architecture firm's contractor failed to secure a payment bond required under 61 O.S.1991 §§ 1 and 2. When the contractor failed to pay the subcontractors, they sued the architecture firm alleging negligence in certifying payments to the contractor in the absence of the statutorily-required payment bond. *Id.*, ¶ 8, 999 P.2d at 442–43. The architecture firm filed a motion to dismiss arguing it did not owe a duty to the subcontractors; there was no privity of contract between them; and, given the subcontractors' constructive knowledge of the contractor's duty to procure a payment bond, the subcontractors' own negligence was the proximate cause of their loss. *Id.* The trial court denied the architecture firm's motion to dismiss. *Id.* After a three-day trial on the merits, the jury found the architecture firm liable in negligence to the subcontractors and returned a special verdict finding the firm's architect had acted wilfully and with reckless disregard for the rights of the subcontractors. *Id.*, ¶ 9, 999 P.2d at 443.

¶ 11 In its review, the Supreme Court noted the fundamental objective of § 2 is to protect subcontractors and materialmen on public construction projects given that no lien rights exist against public land or improvements. *Id.*, ¶ 16, 999 P.2d at 444. The Supreme Court acknowledged it is the duty of the contractor, not the architecture firm, to secure the payment bond, and that "a jury may consider the subcontractors' neglect in failing to personally verify whether a payment bond has been secured." It also observed, however, that the damages in the case "arose from the architect's negligence in failing to ascertain that there was no payment bond and in making unauthorized payments to the contractor after he discovered that no payment bond existed. Damages would not have arisen had the bond been obtained." *Id.*, ¶¶ 17, 24, 999 P.2d at 444, 447.

¶ 12 The Court further reasoned "once a public entity has contracted with a private party to oversee a construction project, subcontractors should be able to assume that the private party responsible for certifying payments has verified the existence of the bonds. To do otherwise, would thwart the purpose and intent of the bond statutes." *Id.*, ¶ 19, 999 P.2d at 445. "Concurrent with a contractor's duty to secure a bond is the public entities' duty to withhold payment to a contractor in the absence of a bond." *Id.*, ¶ 18, 999 P.2d at 445. Finally, "the architect ought to labor under a duty to subcontractors to refrain from paying the contractor without the required statutory payment bond being secured." *Id.*, ¶ 23, 999 P.2d at 447. This holds true despite the lack of privity between the architecture firm and the subcontractors, because the architecture firm's liability "is based upon proximate cause and the foreseeability that [its] conduct could harm third parties." *Id.*, ¶ 22, 999 P.2d at 446.

¶ 13 Thus, in upholding the trial court's denial of the architecture firm's motion to dismiss for failure to state a cause of action, the *Boren* decision stands for the proposition that certain parties involved in contracts for public works have an obligation to subcontractors to ensure contractors obtain payment bonds and thereby avoid the foreseeable harm to subcontractors of non-payment in the absence of lien rights. In other words, "a subcontractor should not be precluded in all circumstances from asserting a claim against an entity such as the [architecture] firm solely because it did not request a copy of the bond." *Id.*, ¶ 24, 999 P.2d at 447.

¶ 14 It is undisputed IFIC permitted BACC to commence work on the Project and issued partial payments to BACC even

though it had full knowledge of BACC's failure to secure a payment bond. Nonetheless, IFIC attempts to distinguish itself from the architecture firm in *Boren* by downplaying its role in the Project. While it is true IFIC did not design the Project as the architecture firm did in *Boren,* it did much more than approve payments to BACC. Indeed, like the architecture firm, it was the entity that actually paid the contractor. Further, as a result of being the surety on OEI's performance bond, IFIC was contractually obligated and responsible to OTA for completion of the Project. In furtherance of this goal, IFIC hired its own overseer to the Project, Gary Bierhalter, whose written approval BACC was required to receive before it could do such things as work overtime. In addition, the Completion Contract between IFIC and BACC requires BACC to fully perform and complete the work under Contract 1335 as if it were the original contractor and specifically prohibits BACC from commencing work on the Project until it secured the necessary bonds. IFIC disregarded this provision and permitted BACC to begin work without the required bonds, thus leaving BACC's subcontractors unprotected. Like the architecture firm in *Boren,* IFIC was in a position to ensure BACC obtained the payment bond, either by not permitting BACC to commence work on the Project as per the Completion Contract or by withholding all payments until BACC secured the bond.

¶ 15 Next, IFIC argues 61 O.S.2001 §§ 1 and 2 apply only to those entities that are awarded public contracts directly. IFIC maintains it is not obligated to fulfill the bond requirements because OTA awarded the original contract to OEI, and IFIC is merely the performance surety. This argument ignores the public policy behind the statute: it is designed to protect subcontractors, laborers, and suppliers in the event the contractor does not pay them, because such persons cannot obtain a lien on public property. *Boren,* ¶ 16, 999 P.2d at 444. This need to protect subcontractors from nonpayment is equally great where, as here, a performance surety has been forced to assume the role of the original contractor due to the original contractor's default in performance.

¶ 16 IFIC's conduct in increasing the retainage from five to ten percent after the Project is fifty percent (50%) complete does not raise a question of fact with respect to the breach of its duty to require BACC to secure a payment bond. The statute does not authorize increasing the retainage amount as an alternative to requiring a bond, and the *Boren* decision speaks of the duty to withhold *any* payment until the contractor secures a payment bond. *Boren,* ¶ 18, n. 23, 999 P.2d at 445. Moreover, that the increased retainage amount was not sufficient to protect subcontractors on the Project is evident by IFIC's failure to pay Hydro Turf for its work when BACC defaulted. IFIC was obligated either to prohibit BACC from commencing work on the Project or to withhold all payments to BACC until BACC obtained the payment bond.

¶ 17 Finally, IFIC's knowledge or lack thereof of BACC's non-payment to Hydro Turf is irrelevant to whether Hydro Turf successfully stated a claim for negligence. Under both the specific terms of its Completion Contract with BACC and the legal precedent established in *Boren,* IFIC should have prohibited BACC from commencing work on the project or withheld all payments to BACC unless and until it secured the necessary bonds. IFIC was obligated to do this regardless of whether BACC paid its subcontractors. For these reasons, we agree with the trial court that IFIC owed a duty to Hydro Turf and Hydro Turf may maintain a negligence action based on IFIC's failure to secure or to cause BACC to secure a payment bond to guarantee payment of its subcontractors.

¶ 18 However, in addition to holding that a party such as IFIC may be liable to subcontractors despite a lack of privity, the *Boren* decision also stands for the proposition that in determining liability under such facts, a jury may consider the extent of the subcontractor's negligence in failing to ascertain the existence of the payment bond prior to commencing work. *Boren,* ¶ 24, 999 P.2d at 447. By granting Hydro Turf's motion for summary judgment on its negligence claim, the trial court kept the question of Hydro Turf's possible contributory negligence from the finder of fact. For this reason, we reverse the trial court's award of summary

judgment to Hydro Turf on the issue of negligence and remand for trial on the merits.

¶ 19 We are compelled to reverse the trial court's grant of summary judgment to Hydro Turf on its unjust enrichment claim as well. Because an adequate remedy at law is available to Hydro Turf through its negligence claim, it was not necessary for the trial court to invoke its equitable jurisdiction on the unjust enrichment issue. *See Billingsley v. North*, 1956 OK 153, ¶ 6, 298 P.2d 418, 422. In any event, the trial court should have considered Hydro Turf's possible negligence in failing to determine whether BACC had secured a payment bond before it commenced work under the subcontract in balancing the equities.

¶ 20 Because we find the trial court erred in awarding summary judgment to Hydro Turf on its negligence and unjust enrichment claims, we also must reverse prejudgment interest award to Hydro Turf.

¶ 21 For these reasons, we reverse the trial court's grant of summary judgment to Hydro Turf and against IFIC on Hydro Turf's negligence, unjust enrichment, and prejudgment interest claims, and remand for trial on the merits.

REVERSED AND REMANDED.

HANSEN, J., and JOPLIN, J., concur.