**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 11 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

BETINA L. TILLMAN, Personal
Representative of the Estate of Filipe
M. Tillman, Deceased,

    Plaintiff-Appellant,

    v.

CAMELOT MUSIC, INC.,

    Defendant-Appellee,

——————————————————

WAL-MART STORES, INC.,

    Amicus Curiae.

No. 03-5172

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. No. CV-02-761-EA (J))**

---

Michael D. Myers of McClanahan & Clearman, L.L.P., Houston, Texas (Scott M.
Clearman and Robert H. Espey, II, of McClanahan & Clearman, L.L.P; James C.
Hodges and Shanann P. Passley of Eller & Detrich, Tulsa, Oklahoma, with him on
the briefs), for Plaintiff-Appellant.

Myron Kirschbaum of Kaye Scholer LLP, New York, New York (Howard
Kleinhendler of Kaye Scholer LLP; Richard M. Eldridge and Thomas E. Steichen
of Eldridge, Cooper, Steichen & Leach P.L.L.C., Tulsa, Oklahoma, with him on
the brief), for Defendant-Appellee.

David L. Bryant, Craig A. Fitzgerald, and Janna Dunagan Hall of the Bryant Law

Firm PLLC, Tulsa, Oklahoma, on the brief for Amicus Curiae Wal-Mart Stores, Inc.

---

Before **EBEL**, **McKAY**, and **O'BRIEN**, Circuit Judges.

---

**McKAY**, Circuit Judge.

---

Defendant Camelot, in an effort to take advantage of a provision in the Internal Revenue Code, purchased life insurance on all of its full-time employees, including Mr. Tillman. When Mr. Tillman subsequently died, Camelot received approximately $340,000 in life insurance proceeds. Upon learning of the life insurance policy and its subsequent pay out, Plaintiff, the personal representative of Mr. Tillman's estate, brought suit pursuant to Oklahoma Insurance Code, which provides in substance that if anyone takes out a contract of insurance, delivered or issued for delivery within the state, on a person in whom it does not have an insurable interest, the insured or his representative may maintain a cause of action to recover the proceeds. *See* Okla. Stat. Ann. tit. 36, §§ 3601, 3604(B) (West 1999). Plaintiff also alleged an alternative theory of unjust enrichment.

The parties do not dispute the material facts; and, except as otherwise noted, the facts set forth here are undisputed.

As a full-time employee, Mr. Tillman was extended a "complete benefits

-2-

package, including medical insurance, profit sharing/401(k) and life insurance . . . ." Aplt. App., Vol. IV, at 831. On February 16, 1990, Camelot purchased approximately 1,400 corporate-owned life insurance ("COLI") policies to insure the lives of all of its full-time[1] employees. The stated purpose of purchasing the COLI policies was to ease its tax burden, which would then help offset the cost of employee health benefits. *Id.* at 824-25. Although purchased to insure the lives of its employees, Camelot actively concealed the existence of the COLI policies from the insured employees. Aplt. App., Vol. I, at 190.

In 1996, four years after Mr. Tillman's death and Camelot's receipt of the policy proceeds, Camelot filed for bankruptcy protection in the District of Delaware. As part of the bankruptcy proceedings, Camelot was disallowed from continuing its COLI-based interest deductions because the policies lacked economic substance and portions of the program were shams-in-fact.

After the above-mentioned lawsuit was filed, Camelot moved the district court to dismiss Plaintiff's second amended complaint arguing that Plaintiff failed to state a claim because the statute of limitations had run. The district court converted the motion to dismiss to a summary judgment motion and denied that motion. Camelot has not appealed that denial. Thereafter, Plaintiff filed a motion

---

[1]Full-time employees, as determined by Camelot and the COLI policies, are those who work more than twenty hours a week for the company.

for partial summary judgment averring that Camelot did not have an insurable interest in Mr. Tillman's life. Camelot filed a cross-motion for summary judgment contending that judgment should be granted in its favor. Camelot articulated the following arguments: (1) Georgia law, not Oklahoma law, applied to this case; (2) Plaintiff's claims were discharged by Camelot's bankruptcy; (3) § 3604 of Oklahoma's insurance code did not apply to the case because the insurance policy at issue was not issued for delivery or delivered in Oklahoma; (4) Camelot had an insurable interest in Mr. Tillman; and (5) Camelot was not unjustly enriched.

The district court held that Oklahoma law applied to the instant dispute, the insurance policy at issue was constructively delivered in Oklahoma, Camelot did have an insurable interest in Mr. Tillman's life, and Camelot was not unjustly enriched when it received approximately $340,000 as a result of Mr. Tillman's death. Based on these holdings, the court denied Plaintiff's motion for partial summary judgment and granted Camelot's motion for summary judgment.

We review *de novo* a district court's grant of summary judgment. *Timmons v. White*, 314 F.3d 1229, 1232 (10th Cir. 2003). In so doing, we apply the same legal standard employed by the district court to determine whether there is a genuine issue of material fact and whether either party is entitled to judgment as a matter of law. *Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1175 (10th Cir. 2001).

## Delivery of the Policy

Title 36 of the Oklahoma Statutes ("Oklahoma Insurance Code"), which governs insurance practices, states in relevant part: "This article shall not apply to . . . (2) Policies or contracts not issued for delivery in Oklahoma nor delivered in Oklahoma . . . ." Okla. Stat. tit. 36 § 3601. Unfortunately, the statute does not separately define what it means to "deliver" or "issue" a policy. Additionally, there are no reported Oklahoma cases specifically interpreting this statute.

The only context in which these terms are discussed is in cases dealing with the validity of an insurance contract that is conditioned on the issuance or delivery of the policy to the policyholder. The following summary of the law is helpful:

> Contracts of insurance are frequently conditioned upon the execution, issuance or delivery of the policy. These terms can have distinct meanings but may also be used interchangeably. For example, the term "issuance" has been employed to refer to the preparation and signing of the policy, the delivery and acceptance of the policy, and to the preparation, execution, and delivery of the instrument as a binding obligation. A distinction between "issuance" and "delivery" is sometimes recognized in construing a statute or determining when a contract of insurance is in effect. "Delivery" is not essential to the completion of a contract which becomes effective, according to its terms, upon the "issuance" of the policy.

Lee R. Russ & Thomas F. Segalia, *Couch on Insurance* § 14:1 (3d ed. 1995). Under Oklahoma law, actual physical delivery is not always required; it may be constructive. *Mid-Continent Life Ins. Co. v. Dees*, 269 P.2d 322, 323 (Okla. 1954).

The instant case is particularly difficult because the insurer never produced, and Camelot never actually received, a physical copy of Tillman's policy. Instead, the insurer provided a form insurance contract to Camelot in Ohio and generated the rest of the contracts electronically, which it then stored on disk. But, despite the fact that the physical policy was never actually delivered to either Tillman or Camelot in Oklahoma, we believe that the policy was constructively delivered.

*Dees* provides support for this contention. In *Dees*, the insured died just one day after the issuance of the policy. 269 P.2d at 322. Although the first premium had been paid and the contract executed, the company had not yet physically delivered a copy of the policy to the insured. Instead, the insurance company mailed a copy of the policy to the local insurance agent with instructions to send it on to the insured, but the agent did not personally deliver the policy before the insured's death. *Id.* The insurance company refused to pay the death benefit on the grounds that delivery of the policy was an express condition to its liability under the contract. *Id.* at 323. Because all of the other steps involved in the issuance of the policy had been completed, the Oklahoma Supreme Court treated the insurer's delivery of the policy to the local agent as constructive delivery to the insured. *Id.*

In this case, the insurance contract does not specifically condition its effectiveness on delivery to either Camelot or Mr. Tillman. However, there is one

important reference to delivery in the document. The policy states that information regarding the method of calculating policy value and cost of insurance "has been filed with the insurance official in the jurisdiction in which this policy is delivered." Aplt. App., Vol. IV, at 851, 853. Defendant concedes that it filed the COLI policy with the Oklahoma Department of Insurance for approval. *Id.* at 1032. Analyzing this action in conjunction with the language in the contract, it is clear that Camelot and its insurance company intended the policy to be delivered in Oklahoma. Otherwise, there would have been no reason to file the policy with the Oklahoma Department of Insurance.

Like the delivery of the policy to the agent in *Dees*, Camelot's delivery of the COLI policy to the Department of Insurance raises an inference of constructive delivery. Furthermore, we note that interpreting the statute to require physical delivery of the contract within state borders would allow all insurance companies to skirt Oklahoma insurance regulations merely by electronically storing the insurance contracts in another jurisdiction.

### Insurable Interest

Having concluded that § 3601 was met, we turn to the question of whether Camelot had an insurable interest in Mr. Tillman's life, one of its rank-and-file employees. Camelot's purchase of life insurance to insure the lives of its employees is not a novel idea. "Corporations have, for many years, purchased life

insurance on the lives of their most valuable employees in order to protect the corporation against economic losses which would occur as a result of the untimely death of such an employee." *American Elec. Power, Inc. v. United States*, 136 F. Supp. 2d 762, 768 (S.D. Ohio 2001); *see also In re CM Holdings, Inc.*, 254 B.R. 578, 586 (D. Del. 2000). This form of insurance was referred to as key-employee insurance. *American Elec.*, 136 F. Supp. 2d at 768; *In re CM Holdings*, 254 B.R. at 586; *see also* Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 8:4 (3d ed. 1995) ("Employers are rather commonly prohibited from being beneficiaries of employees other than those of a specific rank or importance . . . ."). It is widely accepted that corporations have an insurable interest in these key employees;[2] however, corporations like Camelot decided to broaden the scope of COLIs to include all of its full-time employees. *American Elec.*, 136 F. Supp. 2d at 768.

Oklahoma law requires the beneficiary of a life insurance policy to have an insurable interest in the life of the insured in order to be entitled to the proceeds of the policy. Okla. Stat. Ann. tit. 36, § 3604(A). This is known as Oklahoma's insurable interest doctrine. The insurable interest doctrine began as a common-law principle in Oklahoma requiring an insurance beneficiary to have "an interest of

---

[2]Examples of key employees include presidents, officers, principal stockholders (if important to the success of the business), directors, large stockholders who also serve as directors, managing vice presidents, secretaries and general managers, treasurers, and branch managers. Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 43:15 (3d ed. 1995) (collecting cases).

some sort" in the life of the insured. *Mutual Aid Union v. Stephens*, 223 P. 648, 649 (1924). In *Stephens*, the Oklahoma Supreme Court held that plaintiff had an insurable interest in the life of his mother-in-law[3] because "each had reason to rely upon the other in time of need." *Id.* at 650. In reaching this holding, the court noted that the mother-in-law "took charge of the plaintiff's home, and looked after the welfare of the plaintiff's children [after the children's mother died] up to the time of the [mother-in-law's] death." *Id.*

The Oklahoma legislature subsequently codified the insurable interest doctrine. Oklahoma's Insurance Code now defines the requisite interest an insurer must have in an insured as "a lawful and substantial economic interest in having the life, health, or bodily safety of the individual insured continue, as distinguished from an interest which would arise only by, or would be enhanced in value by, the death, disablement or injury of the individual insured." Okla. Stat. Ann. tit. 36, § 3604(C)(2). Since the codification of the insurable interest doctrine, the Oklahoma Supreme Court decided *Hulme v. Springfield Life Insurance Co.*, 565 P.2d 666 (1977). In *Hulme*, plaintiff was the beneficiary of a life insurance policy of his business associate. *Hulme*, 565 P.2d at 667. The court held that plaintiff had an insurable interest in his business associate's life because of the close business (economic) association between the two men, which involved

[3]In an interesting twist, Plaintiff's mother-in-law was also his stepmother.

-9-

extensive sharing of business assets. *Id.* at 667, 670. In each case, both parties substantially depended on each other.

In this case, Plaintiff contends that the district court's application of § 3604 (C)(2) was erroneous because it did not employ a balancing test comparing the amount of money (financial benefit) "Camelot would have received had [Mr. Tillman's] life continued" against the amount of the insurance proceeds "Camelot received when he died." Aplt. Br. at 12. According to Plaintiff, if the latter is more than the former, there is no insurable interest, and vice versa. A careful reading of the statute indicates that it does not require such a weighing.

In support of her balancing-of-monetary-values approach, Plaintiff relies on the phrase "distinguished from." In construing this phrase, we are required to give it its ordinary meaning. *See Biodiversity Legal Found. v. Babbitt*, 146 F.3d 1249, 1254 (10th Cir. 1998). "Distinguish" means to "recognize a difference in." Webster's Third New International Dictionary 659 (1986). It does not mean to compare with. Therefore, we construe the meaning of the phrase "distinguished from" in § 3604(C)(2) to be a means of clarification – *not* as an instruction to weigh the respective monetary values of people alive versus dead. Hence, properly read, § 3604(C)(2) requires a determination of whether a party procuring insurance on another has "a lawful and substantial economic interest in having the life, health, or bodily safety of the individual insured continue," *not* "an interest

-10-

which would arise only by, or would be enhanced in value by, the death, disablement or injury of the individual insured." Okla. Stat. Ann. tit. 36, § 3604(C)(2).

The district court, in holding that Camelot had an insurable interest in Mr. Tillman's life, reasoned that

> [i]t cannot be legitimately denied that Camelot, like all employers, spent valuable resources recruiting, screening, training, and retaining its employees in an effort to generate profits. . . . [It] is simply implausible that a COLI policy, designed for tax benefits, would give any employer an incentive to wager on the lives of its employees, or even former employees.

Aplt. App., Vol. IV, at 1034-35. We agree that employers expend resources, which are undoubtedly valuable to the company, in an effort to recruit and presumably retain employees. However, absent evidence of considerable expenditures in relation to the company's overall budget or other relevant evidence establishing the substantial nature of the expenditure, human resources' monies spent to attract and keep employees is a general cost of doing business and is not sufficient alone to support a finding of a *substantial* interest in a specific employee's continued life. *See Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 407 (5th Cir. 2004) (holding that the employer did not have an insurable interest in an employee because costs associated with "productivity losses, hiring and training a replacement, and payment of death benefits" are attributable to all employees and are not sufficient to demonstrate the employee's special importance to the

company); *Turner v. Davidson*, 4 S.E.2d 814, 817 (Ga. 1939) (explaining that "a substantial economic interest in the life of [an] employee . . . is [where an employer] might be reasonably expected to reap a substantial pecuniary benefit through the continued life of such employee"). This view is consistent with Oklahoma Supreme Court case law. *See Stephens*, 223 P. at 650 (recognizing an insurable interest because the plaintiff and the insured "each had reason to rely upon the other in time of need"); *Hulme*, 565 P.2d at 667, 670 (finding an insurable interest because of the significant mutual reliance the plaintiff and the insured enjoyed in connection with their business association).

Camelot has failed to present the additional evidence required to establish Mr. Tillman's special importance to the company. The sole evidence Camelot presented to support the district court's conclusion that Camelot had an insurable interest in Mr. Tillman's life is that Camelot provided its full-time employees, including Mr. Tillman, with "a complete benefits package, including medical insurance, profit sharing/401(k) and life insurance . . . ." Aplt. App., Vol. IV, at 831. However, these are compensation benefits like wages, not start-up or other costs, which one would expect to amortize over the period of the employee's continued service. Like routine start-up costs, these are costs associated with Camelot's general employees, not just with those who add significant pecuniary benefit to the company. We conclude that the Oklahoma courts would hold, as a

matter of law, that Camelot has failed to present sufficient evidence that it had a lawful and substantial economic interest in Mr. Tillman's continued life. Accordingly, Camelot did not have an insurable interest in Mr. Tillman's life.

### Discharge of Plaintiff's Claims by the Bankruptcy Court

As an alternative argument, Camelot asserts that, even if we hold that Plaintiff has a right to recover the policy's proceeds under Oklahoma law, Plaintiff's lawsuit nonetheless fails because Plaintiff's claims were discharged during Camelot's bankruptcy proceeding. Although fully briefed, the district court did not rule on this issue because it was not necessary to its disposition. Aplt. Appx., Vol. IV, at 1035, n.11. As a general rule, we do not address issues not ruled on by the district court. *Burnette v. Dresser Indus., Inc.*, 849 F.2d 1277, 1282 (10th Cir. 1988). However, because the issue was fully briefed to the district court (as well as to this court) and the resolution of the issue involves a pure question of law, we exercise our discretion to resolve the issue of discharge. *See Colorado Interstate Corp. v. CIT Group/Equip. Fin.*, 993 F.2d 743, 751 (10th Cir. 1993) (deciding an issue raised for the first time on appeal because the issue was considered by the district court, fully briefed to the appellate court, and involved questions of law).[4]

---

[4]We note that Camelot did not appeal the somewhat-related statute of limitations issue. The district court held that the statute of limitations was tolled
(continued...)

On August 9, 1996, Camelot filed for bankruptcy protection in Delaware. Aplt. App., Vol. IV, at 789. As part of the bankruptcy proceedings, the bankruptcy court issued a bar order on December 6, 1996, requiring that all potential claimants file proof of their claim[5] prior to January 30, 1997, or be barred from proceeding on that claim. *Id.* at 911. Camelot gave notice of the bar date to all unknown creditors through publication in *The Wall Street Journal*. *Id.* at 915, 918. Camelot's bankruptcy was subsequently confirmed, discharging all then-existing claims.[6] *In re CM Holdings, Inc.*, 264 B.R. 141, 144 (D. Del. 2000).

Camelot argues that its notice by publication was sufficient to satisfy the requirements of due process because Plaintiff was an unknown creditor. "An

---

[4](...continued)
because of Camelot's active concealment of "the existence of its COLI policies from its employees and their families." Aplt. App., Vol. IV, at 1022-24.

[5]The Bankruptcy Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured . . . ." 11 U.S.C. § 101(5)(A).

[6]Plaintiff argues that, pursuant to Oklahoma state law, her claim did not accrue until after the bankruptcy court's discharge order. Aplt. Reply Br. at 24. However, Plaintiff's assertion is contradicted by an explicit district court ruling which Plaintiff did not appeal. Indeed, the district court found that Plaintiff's claim for violation of Oklahoma's insurable interest statute accrued the day Camelot bought the policy and that Plaintiff's unjust enrichment claim accrued the day Camelot received the policy benefits. Aplt. App., Vol. IV, at 1022. Plaintiff did not appeal this adverse ruling, and we will therefore not address it. *See Snell v. Tunnell*, 920 F.2d 673, 676 (10th Cir. 1990) (explaining that this court will not decide issues not appealed).

'unknown' creditor is one whose 'interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to the knowledge [of the debtor].'" *In re U.S.H. Corp. of New York*, 223 B.R. 654, 659 (S.D.N.Y. 1998) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 317 (1950)). If a creditor is unknown, notice by publication is oftentimes sufficient to satisfy due process: "When a creditor is unknown to the debtor, publication notice of the claims bar date *may* satisfy the requirements of due process." *Id.* at 658 (emphasis added) (citing *Mullane*, 339 U.S. at 317-18). This permissive, non-mandatory language leaves room for deciding cases like this one in favor of the unknown creditor.

Assuming, *arguendo*, that Plaintiff is an unknown creditor,[7] Camelot's publication was nonetheless insufficient to satisfy the requirements of due process. The facts of this case demonstrate the prudence of not having the rule regarding publication *always* satisfy due process requirements. *See id.* As the district court found, "Camelot took precautions to prevent Camelot employees and their families from discovering the policies because the company did not want the employees or their families claiming some entitlement to the benefits." Aplt. App., Vol. IV, at

---

[7]Plaintiff vigorously argues that she is a known creditor of Camelot. However, because that distinction would not change the outcome of this case, we will consider Plaintiff an unknown creditor. *Griffin v. Davies*, 929 F.2d 550, 554 (10th Cir. 1991) (explaining that this court "will not undertake to decide issues that do not affect the outcome of a dispute.").

-15-

1023. The testimony of Camelot's former Chief Financial Officer and Vice President of Finance, Jack Rogers, supports that finding:

> Q: Now, Mr. Rogers, Camelot took precautions to prevent the employees from learning of the fact that Camelot had taken insurance on their lives; isn't that correct?
> A: That's correct. Yes.
> Q: In fact, they even went to the step of making sure that what death benefit proceeds came in did not go into the general account of Camelot; correct?
> A: Yes, that's true, because once you let a few people know, a few people are going to tell a few more people and you might as well tell the entire company. If you make the decision to keep this information limited to a small group, you have to work hard to keep it maintained to a small group.

Aplt. App., Vol. I, at 190. Because Camelot actively concealed the existence of the policies from all potential plaintiffs, publication by notice did not discharge Plaintiff's claim. When a party conceals the necessary facts upon which a claim is to be made, that party cannot benefit from publication by notice. Due process does not allow a debtor who has actively concealed facts necessary to the presentation of certain claims to notify by publication those persons adversely affected by the active concealment. *See c.f.*, *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987) (The Due Process Clause mandates fundamental fairness.); *Daniels v. Williams*, 474 U.S. 327, 331 (1986) ("[T]he Due Process Clause promotes fairness . . . .").[8]

---

[8]We are further persuaded of this view by the fact that the Bankruptcy Code forbids discharge of debts incurred by fraud. 11 U.S.C. § 523(a)(2)(A). While not directly applicable because this case deals with concealment, not fraud, it

(continued...)

We hold that Plaintiff's claims are not barred by bankruptcy discharge.

## Unjust Enrichment

Plaintiff's alternative claim in her complaint is that Camelot was unjustly enriched when it received the proceeds of the COLI policy after Mr. Tillman died. The district court granted Camelot summary judgment and dismissed this claim. Aplt. Appx., Vol. IV, at 1035. Plaintiff appeals this decision.

"A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another." *Lapkin v. Garland Bloodworth, Inc.*, 23 P.3d 958, 961 (Okla. Ct. App. 2000). In this case, there is no evidence of an advantage enuring to Camelot's benefit at Mr. Tillman's expense. Camelot paid all of the premiums for the COLI policy on Mr. Tillman's life. In so doing, Mr. Tillman was not prevented from obtaining life insurance himself.

In addition, "before a party may recover unjust enrichment, there must be enrichment to another coupled with a resulting injustice." *Teel v. Public Serv. Co. of Okla.*, 767 P.2d 391, 398 (Okla. 1985) (superceded by statute on other grounds). It is true that Camelot obtained approximately $340,000 when Mr. Tillman died;

---

[8](...continued)
nonetheless provides analogous support for our conclusion.

however, that enrichment did not result in an injustice to Mr. Tillman. The injustice for which Plaintiff complains is that Camelot violated the law in obtaining insurance on Mr. Tillman's life. Oklahoma law provides that courts are not to invoke their equitable jurisdiction when an adequate legal remedy is available. *Hydro Turf, Inc. v. International Fidelity Ins. Co.*, 91 P.3d 667, 673 (Okla. Ct. App. 2004) ("Because an adequate remedy at law is available to [the plaintiff] through its negligence claim, it was not necessary for the trial court to invoke its equitable jurisdiction on the unjust enrichment issue."). As explained more fully above, Plaintiff has an adequate legal remedy under § 3604 of Oklahoma's insurance code.[9] We hold that the district court properly dismissed Plaintiff's claim for unjust enrichment.

For the above reasons, we **AFFIRM** the district court's rulings on constructive delivery and on Plaintiff's unjust enrichment claim, **REVERSE** the district court's ruling on insurable interest, and **REMAND** for proceedings consistent with this opinion.

---

[9]Plaintiff not only claims violation of statute as a basis for the unjust enrichment claim, but also claims Camelot improperly used confidential information to obtain the COLI policy. Aplt. Br. at 22. Had Plaintiff properly pled invasion of privacy as one of the bases for the unjust enrichment claim, Plaintiff may have had another adequate remedy at law. *McCormack v. Oklahoma Pub. Co.*, 613 P.2d 737, 740 (Okla. 1980).

-18-