If the jury believed Ginn's version of the facts, then Ginn did not breach a duty to ensure that the documents were signed before or after the closing. Instead, Balames' injury was caused by his failure to follow Ginn's advice, his failure to review the documents for the required signatures, and his misrepresentation to Ginn that the documents were signed.

Because the court incorrectly concluded that plain error permeated the trial, we presume that the jury's general verdict for Ginn shows it found for him on all the submitted issues. Those issues included (1) whether Ginn breached a duty of care, (2) whether Balames' negligence was the sole proximate cause of his own injury, and (3) whether the statute of limitations for malpractice claims barred Balames' recovery even if he proved his claim. Because we presume that the jury determined these issues in Ginn's favor, we vacate the court's judgment and remand with directions for it to reinstate the judgment for Ginn.

JUDGMENT VACATED, AND CAUSE
REMANDED WITH DIRECTIONS.

STEPHAN, J., not participating.

———————————

CHAD P. JOHNSON, APPELLANT AND CROSS-APPELLEE, V.
CHRIS M. NELSON, PERSONAL REPRESENTATIVE OF
THE ESTATE OF STEWART S. MINNICK, DECEASED,
ET AL., APPELLEES AND CROSS-APPELLANTS.

___ N.W.2d ___

Filed April 17, 2015.   No. S-14-049.

1. **Summary Judgment.** Summary judgment is proper if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

2. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.

3. **Summary Judgment: Jurisdiction: Appeal and Error.** When reviewing cross-motions for summary judgment, an appellate court acquires jurisdiction over

both motions and may determine the controversy that is the subject of those motions; an appellate court may also specify the issues as to which questions of fact remain and direct further proceedings as the court deems necessary.

4. **Specific Performance: Real Estate: Contracts.** The equitable remedy of specific performance regarding a contract for the sale of real estate may be granted where a valid, binding contract exists which is definite and certain in its terms, mutual in its obligation, free from overreaching fraud and unfairness, and where the remedy at law is inadequate.

5. **Contracts: Specific Performance: Proof.** Before a court may compel specific performance, there must be a showing that a valid, legally enforceable contract exists. The burden of proving a contract is on the party who seeks to compel specific performance.

6. **Contracts: Insurance: Public Policy.** At common law, life insurance policies issued to a party not having an insurable interest in the life of an insured are considered a wager on the life of another and therefore void as being against public policy.

7. **Public Policy: Words and Phrases.** Public policy is that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public or against the public good, the principles under which the freedom of contract or private dealings are restricted by law for the good of the community.

8. **Contracts: Public Policy.** A contract which is clearly contrary to public policy is void.

9. ____: ____. The determination of whether a contract violates public policy presents a question of law.

10. **Standing: Jurisdiction: Parties.** Standing is a jurisdictional component of a party's case; only a party who has standing may invoke the jurisdiction of a court.

11. **Standing.** It is the party initiating the suit who must meet the standing requirement, not a defendant.

12. **Courts: Contracts: Public Policy.** The power of courts to invalidate contracts for being in contravention of public policy is a very delicate and undefined power which should be exercised only in cases free from doubt.

13. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

Appeal from the District Court for Frontier County: David Urbom, Judge. Affirmed.

Nathaniel J. Mustion, of Mousel, Brooks, Garner & Schneider, P.C., L.L.O., and Victor E. Covalt III and Adam R. Little, of Ballew, Covalt & Hazen, P.C., L.L.O., for appellant.

Terry R. Wittler, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., for appellees.

Heavican, C.J., Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Stephan, J.

In 2007, Chad P. Johnson and Stewart S. Minnick entered into a written agreement whereby, after Minnick's death, Johnson would purchase farmland he had been renting from Minnick and Minnick's sister for a specified price. The purchase price was to be funded by an insurance policy owned by Johnson on Minnick's life. Following Minnick's death in 2012, the proceeds of the policy were paid to Johnson. He tendered them pursuant to the agreement, but the personal representative of Minnick's estate refused to consummate the sale.

Johnson then brought an action for specific performance and other relief. The district court for Frontier County held the purchase agreement was unenforceable, because (1) Minnick lacked authority to enter into it on behalf of his sister and (2) the agreement provided no means of allocating the purchase price to only that portion of the property which Minnick owned in his own right. The court also held that Johnson's claim for damages was time barred and dismissed a counterclaim filed by the personal representative and Minnick's heirs seeking equitable distribution of the insurance proceeds that had been paid to Johnson. Although our reasoning differs from that of the district court, we affirm its judgment.

## BACKGROUND

### Facts

Since 1997, Johnson has farmed land owned by Minnick and Minnick's sister Mary E. Nelson pursuant to an oral lease agreement. The lease terms required Johnson to pay cash rent for pastureland and to pay a share of the crop on the remaining land. The land is made up of two contiguous tracts. What is referred to in the record as "Tract 1" was owned solely by Minnick, and what is referred to as "Tract 2" was owned by Minnick and Nelson as tenants in common. Minnick's family had a long association with the land. Johnson always dealt directly with Minnick on matters pertaining to both tracts; Nelson had no direct involvement.

In the fall of 2006, Johnson met with an insurance agent and discussed taking out a life insurance policy on Minnick and then using the proceeds to purchase the farmland after Minnick's death. The agent was Johnson's cousin. The agent advised Johnson that he would need an insurable interest in Minnick's life and recommended that Johnson and Minnick enter into a buyout agreement. Minnick agreed to the plan and worked with the agent to find a company willing to issue a $500,000 insurance policy on his life. Eventually, an application for life insurance signed by both Johnson and Minnick was submitted to a life insurance company and a policy was issued with an effective date of March 12, 2007. Johnson was the owner of the policy, Minnick was the named insured, and Johnson and his wife were the primary and secondary beneficiaries, respectively. On the effective date of the policy, Minnick was 80 years old.

The buyout agreement is dated January 16, 2007. It specifically provides that Johnson will purchase life insurance on Minnick; that on Minnick's death, Johnson will pay the proceeds of the policy to the personal representative of Minnick's estate; and that the estate shall then transfer the farmland to Johnson. The agreement is signed by Johnson, Minnick, and "Mary Nelson by Stewart Minnick, P.O.A."

Minnick died in January 2012. He never married, and had no surviving children. Nelson was his only surviving sibling. His will, executed in 2002, designates Nelson's three adult children as residual beneficiaries.

Prior to Minnick's death, Johnson paid approximately $170,000 in premiums on the life insurance policy. After Minnick died, the insurer paid the policy proceeds of $500,000 to Johnson. Johnson then tendered this amount to the personal representative of Minnick's estate and requested conveyance of the farmland pursuant to the buyout agreement. The personal representative refused to convey the farmland.

Nelson testified that she and Minnick discussed the possibility of selling the farmland on only one occasion, in late 2006, and that she told Minnick at that time she was unwilling to sell. She denied giving Minnick either verbal permission or

a written power of attorney authorizing him to enter into the agreement with Johnson on her behalf. There is no power of attorney in the record, and the parties agree that Minnick had no authority to enter into the agreement on behalf of Nelson. During his lifetime, Minnick did not disclose the agreement to Nelson, her children, or the attorney who drew his will and regularly handled his financial affairs.

PROCEDURAL HISTORY

Following Minnick's death, the personal representative published a notice to creditors stating that claims against the estate were to be filed by April 17, 2012. On March 21, Johnson filed a claim against Minnick's estate in the county court for Furnas County, seeking specific performance of the buyout agreement. On April 2, the personal representative mailed a notice of disallowance of the claim to Johnson.

On July 2, 2012, Johnson filed this action in the district court for Frontier County seeking specific performance of the buyout agreement and other relief. In the operative complaint, he alleged that when the agreement was executed in 2007, the farmland was worth approximately $450,000, and that the farmland was worth $1.25 million at the time of Minnick's death in 2012. The original defendants were Nelson and the personal representative. Nelson's three children later intervened in their individual capacities. For purposes of clarity, we shall refer to the personal representative, Nelson, and her children collectively as "the estate."

In his amended complaint, Johnson alleged that Minnick owned tract 1 in fee simple and owned an undivided one-half interest in tract 2. Johnson acknowledged that when Minnick executed the buyout agreement, he lacked the requisite power of attorney to convey Nelson's interest. Johnson further alleged that an award of damages would not adequately compensate him for the personal representative's "refusal to convey that portion of the *Real Estate* that . . . Minnick had the power to contract to sell." Johnson sought specific performance of the buyout agreement; he asked the court to require the personal representative to convey to him title to

tract 1 and title to "Minnick's undivided one-half (1/2) interest" in tract 2. In separate causes of action, Johnson sought reformation of the contract and damages for negligent and fraudulent misrepresentation.

The estate filed an answer alleging that the buyout agreement was void for various reasons, including that Johnson lacked an insurable interest in Minnick's life. It also alleged that Johnson's claim for damages was barred by his failure to file a timely claim as required by Neb. Rev. Stat. § 30-2485 (Cum. Supp. 2014). In addition, it asserted counterclaims for slander of title and equitable distribution of the insurance proceeds.

Johnson moved for partial summary judgment on his specific performance claim, and the estate moved for summary judgment in its favor with respect to all of Johnson's claims. In overruling Johnson's motion for summary judgment, the district court rejected the estate's claim that the buyout agreement was void as against public policy because Johnson had no insurable interest in Minnick's life, reasoning the estate had no standing to raise that claim. The court also rejected the estate's claims that the buyout was unenforceable as an "agreement to agree" or as an unreasonable restraint on alienation of land. The court determined, however, that the buyout agreement could not be specifically performed, because there was no means of apportioning the $500,000 purchase price between Minnick's interest in the land and Nelson's interest in the land. Further, the court determined that Johnson's claim for damages was time barred by § 30-2485(a)(1), because he filed this action more than 60 days after the notice of disallowance of claim was mailed.

The district court also dismissed the estate's counterclaim for equitable distribution, concluding that only the insurer can assert a claim against a beneficiary based upon a lack of insurable interest. The court ultimately entered summary judgment for the estate on all of Johnson's claims, and the estate dismissed its counterclaim for slander of title.

Johnson filed this timely appeal, and the estate cross-appealed. We granted the estate's petition to bypass.

## ASSIGNMENTS OF ERROR

Johnson assigns, restated and summarized, that the district court erred (1) in failing to grant specific performance of the buyout agreement and (2) in dismissing his claim for damages.

On cross-appeal, the estate assigns, restated and summarized, that the district court erred in (1) failing to rule that the buyout agreement was an unreasonable restraint on alienation, an unenforceable agreement to agree, or void due to the absence of an insurable interest, and (2) holding that it could not assert an equitable claim to the insurance proceeds paid to Johnson based upon a claim that Johnson lacked an insurable interest in Minnick's life.

## STANDARD OF REVIEW

[1] Summary judgment is proper if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[1]

[2] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.[2]

[3] When reviewing cross-motions for summary judgment, an appellate court acquires jurisdiction over both motions and may determine the controversy that is the subject of those motions; an appellate court may also specify the issues as to which questions of fact remain and direct further proceedings as the court deems necessary.[3]

---

[1] *Stick v. City of Omaha*, 289 Neb. 752, 857 N.W.2d 561 (2015); *Southwind Homeowners Assn. v. Burden*, 283 Neb. 522, 810 N.W.2d 714 (2012).

[2] *Steinhausen v. HomeServices of Neb.*, 289 Neb. 927, 857 N.W.2d 816 (2015); *Brothers v. Kimball Cty. Hosp.*, 289 Neb. 879, 857 N.W.2d 789 (2015).

[3] *Chicago Lumber Co. of Omaha v. Selvera*, 282 Neb. 12, 809 N.W.2d 469 (2011).

## ANALYSIS

### SPECIFIC PERFORMANCE

[4,5] The equitable remedy of specific performance regarding a contract for the sale of real estate may be granted where a valid, binding contract exists which is definite and certain in its terms, mutual in its obligations, free from overreaching fraud and unfairness, and where the remedy at law is inadequate.[4] Before a court may compel specific performance, there must be a showing that a valid, legally enforceable contract exists.[5] The burden of proving a contract is on the party who seeks to compel specific performance.[6]

The estate alleged that specific performance was improper for four reasons: (1) The buyout agreement was simply an agreement to agree, (2) the buyout agreement was an unreasonable restraint on alienation, (3) there was no means of abating the purchase price to account for Nelson's interest, and (4) the buyout was void because Johnson lacked an insurable interest in Minnick's life. The district court determined the buyout was not simply an agreement to agree and was not an unreasonable restraint on alienation. It also concluded that because there was no means of abating the purchase price to account for Nelson's interest, the buyout agreement could not be enforced by ordering specific performance. The court refused to decide whether Johnson lacked an insurable interest in Minnick's life, reasoning the estate lacked standing to raise that defense. Both Johnson and the estate challenge the district court's ruling on specific performance.

We first address the estate's claim that the buyout was void because Johnson lacked an insurable interest in Minnick's life.

[6-9] At common law, life insurance policies issued to a party not having an insurable interest in the life of an insured are considered a wager on the life of another and therefore

---

[4] See *Mohrlang v. Draper*, 219 Neb. 630, 365 N.W.2d 443 (1985).

[5] *Satellite Dev. Co. v. Bernt*, 229 Neb. 778, 429 N.W.2d 334 (1988).

[6] *Id.*

void as being against public policy.[7] In contract and insurance
law, public policy is that principle of the law which holds
that no subject can lawfully do that which has a tendency
to be injurious to the public or against the public good, the
principles under which the freedom of contract or private deal-
ings are restricted by law for the good of the community.[8] A
contract which is clearly contrary to public policy is void.[9]
The determination of whether a contract violates public policy
presents a question of law.[10]

The district court rejected this defense on the ground that
the estate did not have standing to question Johnson's insurable
interest in Minnick's life. In reaching this conclusion, it relied
on *Ryan v. Tickle*,[11] an action brought by the widow of the
insured and the executrix of his estate to recover the proceeds
of a life insurance policy taken out by the insured's former
business partner and paid to the partner upon the insured's
death. The issue was whether the executrix could sue the for-
mer partner to recover the policy proceeds, based on a claim
that he lacked an insurable interest in the life of the insured.
We concluded that the widow/executrix had "no standing or
right to bring [the] lawsuit."[12]

[10,11] In the estate's cross-appeal, it argues that the dis-
trict court erred in concluding that *Ryan* precluded it from
asserting that the buyout agreement was void as a defense to
Johnson's claim for specific performance. It argues that *Ryan*

---

[7] See, *Warnock v. Davis*, 104 U.S. (14 Otto) 775, 26 L. Ed. 924 (1881);
*Chamberlain v. Butler*, 61 Neb. 730, 86 N.W. 481 (1901). See, also, 28
Bertram Harnett & Irving I. Lesnick, Appleman on Insurance 2d, Life
Insurance § 174.01[A] (2006).

[8] *American Fam. Mut. Ins. Co. v. Hadley*, 264 Neb. 435, 648 N.W.2d 769
(2002); *Volquardson v. Hartford Ins. Co.*, 264 Neb. 337, 647 N.W.2d 599
(2002).

[9] *Bamford v. Bamford, Inc.*, 279 Neb. 259, 777 N.W.2d 573 (2010).

[10] *Law Offices of Ronald J. Palagi v. Howard*, 275 Neb. 334, 747 N.W.2d
1 (2008); *American Fam. Mut. Ins. Co. v. Hadley, supra* note 8; *Ploen v.
Union Ins. Co.*, 253 Neb. 867, 573 N.W.2d 436 (1998).

[11] *Ryan v. Tickle*, 210 Neb. 630, 316 N.W.2d 580 (1982).

[12] *Id.* at 634, 316 N.W.2d at 582.

involved an issue of standing to seek affirmative relief, not the assertion of a defense. Standing is a jurisdictional component of a party's case; only a party who has standing may invoke the jurisdiction of a court.[13] In *Community Dev. Agency v. PRP Holdings*,[14] we stated that it is the party initiating the suit who must meet the standing requirement, not a defendant. Other jurisdictions hold likewise. For example, the Colorado Supreme Court has observed that "[t]raditional concerns surrounding standing are not implicated when a defendant's standing is challenged; a defendant may assert an affirmative defense in response to a complaint, which asserts that the defendant has an interest in the action."[15] Similarly, the Idaho Supreme Court has held that "'[s]tanding is a subcategory of justiciability, and the standing inquiry is focused on the party seeking relief.'"[16]

We acknowledge that there is language in *Ryan* which, taken out of context, could suggest that a party other than the insurer cannot raise the lack of an insurable interest under any circumstances. For example, we stated in *Ryan* that there was established law in other jurisdictions that "only the insurer can raise the objection of want of an insurable interest."[17] But, as noted, *Ryan* involved a claim brought against a beneficiary to recover policy proceeds on the ground that the beneficiary lacked an insurable interest, as did *Secor v. Pioneer Foundry*,[18] the principal case on which *Ryan* relied. Because *Ryan* dealt with a challenge to insurable interest only in the context of standing to assert a claim to insurance proceeds,

---

[13] *Brook Valley Ltd. Part. v. Mutual of Omaha Bank*, 281 Neb. 455, 797 N.W.2d 748 (2011).

[14] *Community Dev. Agency v. PRP Holdings*, 277 Neb. 1015, 767 N.W.2d 68 (2009).

[15] *Mortgage Investments v. Battle Mountain*, 70 P.3d 1176, 1182 (Colo. 2003).

[16] *Stonebrook Const. v. Chase Home Finance*, 152 Idaho 927, 930, 277 P.3d 374, 377 (2012), quoting *Taylor v. AIA Services Corp.*, 151 Idaho 552, 261 P.3d 829 (2011).

[17] *Ryan, supra* note 11, 210 Neb. at 634, 316 N.W.2d at 582.

[18] *Secor v. Pioneer Foundry*, 20 Mich. App. 30, 173 N.W.2d 780 (1969).

we do not read it as precluding the assertion of the estate's defense that the buyout agreement is unenforceable because its funding mechanism is an insurance policy on the life of one in whom the owner and beneficiary of the policy had no insurable interest.

The question, then, is whether the defense has merit. In Nebraska, an "[i]nsurable interest, in the matter of life and health insurance, exists when the beneficiary because of relationship, either pecuniary or from ties of blood or marriage, has reason to expect some benefit from the continuance of the life of the insured."[19] Johnson and Minnick were not related by blood or marriage, so the question of whether Johnson had an insurable interest in Minnick's life turns on their "pecuniary" relationship.

This court has not decided the type of pecuniary or economic relationship which may form the basis of an insurable interest in the context of life insurance. Some courts have held that one business partner may have an insurable interest in the life of another business partner where there is an expectation of pecuniary benefit from the continued life of the insured partner.[20] But Johnson acknowledged that he and Minnick were not business partners. Courts have also held that a business entity may have an insurable interest in the life of a key employee whose death would adversely affect the business.[21] But there was no employment relationship between Johnson and Minnick. Under some circumstances, a creditor has been held to have an insurable interest in the life of a debtor.[22] But the record reflects no such relationship between Johnson and Minnick.

---

[19] Neb. Rev. Stat. § 44-103(13)(b) (Reissue 2010).

[20] See, e.g., *Graves v. Norred*, 510 So. 2d 816 (Ala. 1987); *Ridley v. VanderBoegh*, 95 Idaho 456, 511 P.2d 273 (1973).

[21] See, e.g., *U.S. v. Supplee-Biddle Co.*, 265 U.S. 189, 44 S. Ct. 546, 68 L. Ed. 970 (1924); *Murray, Exrs., v. G. F. Higgins Co.*, 300 Pa. 341, 150 A. 629 (1930); *Mutual Life Ins. Co. v. Board*, 115 Va. 836, 80 S.E. 565 (1914).

[22] See, e.g., *Cosentino v. William Penn Life Ins. Co. of New York*, 224 A.D.2d 777, 636 N.Y.S.2d 943 (1996).

At the time the policy issued, the relationship between Johnson and Minnick was that of (1) landlord and tenant under an oral farm lease and (2) parties to the buyout agreement, which could be performed only after Minnick's death. A similar relationship was the subject of a Maryland case, *Beard v. American Agency*.[23] There, a farmer who leased land and had an option to purchase it after the owner's death purchased an insurance policy on the life of the owner, planning to use the proceeds to purchase the land after the owner died. After the landowner's death, the insurer sought a declaratory judgment that the farmer had no insurable interest in the life of the landowner and that the policy was therefore void. A Maryland statute defined an insurable interest in the life of an unrelated person as "'a lawful and substantial economic interest in having the life . . . of the individual insured continue, as distinguished from an interest which would arise only by, or would be enhanced in value by, the death'"[24] of such person. The court reasoned that this standard was not met, because the farmer would not receive any particular benefit from the continued life of the landlord; at best he would remain a tenant on the land while the landlord was alive, and would realize an economic benefit only after the landowner died. And the court held that the relationship between the farmer and the landowner could not be considered a partnership, noting that payment of rent, whether in the form of cash or a share of the farm's profits, would not create an inference supporting the existence of a partnership.

We need not decide whether a landlord-tenant relationship with respect to agricultural property could ever form the basis of an insurable interest. We conclude only that in this case, as in *Beard*, it did not. The agent who procured the policy for Johnson described the insurable interest as "guaranteeing a buyer for . . . Minnick and his sister at a price agreeable to both parties, while at the same time ensuring . . . Johnson and his family the opportunity and resources to purchase this farm property essential to continuing their farm business." But

---

[23] *Beard v. American Agency*, 314 Md. 235, 550 A.2d 677 (1988).

[24] *Id*. at 245, 550 A.2d at 681.

this does not meet the requirement of § 44-103(13)(b) that for there to be an insurable interest, the beneficiary must have "reason to expect some benefit from the continuance of the life of the insured." Like the farmer in *Beard,* Johnson had no reason to expect any pecuniary benefit from the continuance of his landlord's life. As long as Minnick lived and was willing to rent the land to Johnson, Johnson would remain a tenant on the land. The only difference in the relationship after the execution of the buyout agreement was that Johnson had the financial obligation to pay premiums on the life insurance policy. The longer Minnick lived, the more premiums Johnson had to pay to keep the policy in force. Under this arrangement, Johnson's pecuniary interest would not benefit from the continuation of Minnick's life; to the contrary, it would benefit from Minnick's death before additional premiums came due. In effect, Johnson was gambling that Minnick would die sooner rather than later. This is precisely the reason why an insurance policy on the life of one in whom the owner and beneficiary of the policy lacks an insurable interest is void as against public policy.[25]

[12,13] The insurance policy on Minnick's life was an integral component of the buyout agreement which Johnson sought to enforce after Minnick's death. The agreement was the reason for the policy, and the policy was the exclusive financing mechanism for the agreement. The power of courts to invalidate contracts for being in contravention of public policy is a very delicate and undefined power which should be exercised only in cases free from doubt.[26] We are satisfied that this is one of those cases. We conclude that the buyout agreement was void as against public policy because it incorporated a financing mechanism consisting of a life insurance policy in which the owner and beneficiary lacked an insurable interest in the life of the insured. We therefore agree with the district court that the buyout agreement was not specifically

---

[25] See sources cited *supra* note 7.

[26] *Hearst-Argyle Prop. v. Entrex Comm. Servs.*, 279 Neb. 468, 778 N.W.2d 465 (2010); *Myers v. Nebraska Invest. Council*, 272 Neb. 669, 724 N.W.2d 776 (2006).

enforceable as a matter of law, although for different reasons than those articulated by the district court.[27] Because we reach this determination, we need not address the other assignments of error relating to specific performance; an appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.[28]

## Claim for Damages

Johnson argues that the district court erred in determining that his alternative claim for damages based on theories of breach of contract, fraudulent misrepresentation, and negligent misrepresentation was time barred by § 30-2485(a)(1). That statute provides that all claims against a decedent's estate which arose before the death of the decedent are barred unless presented within 2 months after the date of the first publication of notice to creditors. Under Neb. Rev. Stat. § 30-2486 (Reissue 2008), claims against a decedent's estate may be presented either by filing a written statement with the clerk of the court[29] or by commencing an action against the personal representative in any court having subject matter jurisdiction and personal jurisdiction.[30] If the claim is presented by filing a written statement with the clerk of the court, then "no proceeding thereon may be commenced more than sixty days after the personal representative has mailed a notice of disallowance."[31]

Here, notice to creditors was first published on February 2, 2012, and creditors were required to file claims by April 17. Johnson filed a claim with the clerk of the Furnas County Court on March 21. A notice of disallowance of his claim was mailed to him on April 2. The notice specifically stated that failing to commence a proceeding within 60 days after the mailing of the notice would forever bar the claim.

---

[27] See *Tyson Fresh Meats v. State*, 270 Neb. 535, 704 N.W.2d 788 (2005).

[28] *Whitesides v. Whitesides, ante* p. 116, 858 N.W.2d 858 (2015); *Millennium Laboratories v. Ward*, 289 Neb. 718, 857 N.W.2d 304 (2014).

[29] § 30-2486(1).

[30] § 30-2486(2).

[31] § 30-2486(3).

This action was filed on July 2, 2012, which was outside the 60-day period specified in § 30-2486(3), and for that reason, the district court concluded it was time barred. In his brief, Johnson asserts that he filed and served a petition for allowance of claim in the county court on April 10, 2012. He concedes this document does not appear in the record, but argues its existence "can, and should have been, inferred from the record."[32] Specifically, he contends the existence of this document can be inferred because the attorney for the personal representative testified that he prepared a motion to summarily deny a claim on May 21, thus creating the inference that there was a claim to deny.

We find no merit in this argument. If such a document existed, Johnson had the opportunity to offer it into evidence at the summary judgment hearing. Even though Johnson as the party opposing a motion for summary judgment is entitled to all reasonable inferences in his favor,[33] he cannot avoid summary judgment on a record that clearly demonstrates his claim was time barred by speculating that he may have actually filed in time in another court.

For completeness, we note that Johnson also argues that the district court lacked subject matter jurisdiction to decide whether his claim for damages was timely filed, because the probate court has exclusive jurisdiction over claims against the estate. This argument is also without merit. Johnson invoked the jurisdiction of the district court to adjudicate his claim for damages, and the district court clearly had subject matter jurisdiction to interpret and apply the nonclaim statutes in order to adjudicate the defense that the action was time barred.

## Counterclaim for
## Insurance Proceeds

The estate counterclaimed for "Equitable Distribution of [the] Insurance Proceeds," alleging that because Johnson

---

[32] Brief for appellant at 27.

[33] See *O'Brien v. Bellevue Public Schools*, 289 Neb. 637, 856 N.W.2d 731 (2014).

lacked an insurable interest in Minnick's life, Minnick's estate and heirs "are the proper beneficiaries of any insurance upon his life." The estate prayed for judgment against Johnson in the amount of $500,000, the amount of the life insurance policy proceeds.

The district court dismissed this counterclaim, reasoning it was barred by our holding in *Ryan v. Tickle*.[34] In its cross-appeal, the estate contends this was error and asks us to impose a constructive trust on the life insurance proceeds paid to Johnson in favor of the estate.

This claim is barred by our holding in *Ryan*, because the estate lacks standing to assert the claim against Johnson. But the estate asks that we overrule *Ryan*, because the "only effective means of enforcing the prohibition against wagers on an individual's life is to remove the economic incentive for such wagers by recognizing that the estate and heirs of the deceased have standing to challenge the payment of policy proceeds to a beneficiary lacking an insurable interest."[35]

Although *Ryan* is consistent with case law in other jurisdictions,[36] the reasoning on which it and other similar cases relies has been questioned. The insurable interest doctrine "evolved to protect the *public* from wagering contracts and incentives to the destruction of property or lives."[37] Nothing about the doctrine was meant to protect the interests of insurance companies; thus, for the courts to allow only the insurer to raise the issue seems incongruent. The rule that only the insurer can raise a lack of an insurable interest is also somewhat at odds with a corollary rule, also followed by a majority of jurisdictions, that an insurer, by entering into a life

---

[34] *Ryan v. Tickle, supra* note 11.

[35] Reply brief for appellees at 4.

[36] See, generally, 28 Harnett & Lesnick, *supra* note 7, § 174.10[A]; 3 Steven Plitt et al., Couch on Insurance 3d §§ 41:5 and 41:6 (2011).

[37] Peter Nash Swisher, *The Insurable Interest Requirement for Life Insurance: A Critical Reassessment*, 53 Drake L. Rev. 477, 532 (2005) (emphasis supplied), quoting Robert H. Jerry II, Understanding Insurance Law § 47[b] (3d ed. 2002).

insurance contract with someone who lacks an insurable interest in the insured, does not waive the lack of an insurable interest defense by waiver or estoppel, or even by an incontestability clause in the contract.[38] Courts adopt this rule by reasoning that the insurable interest doctrine is intended to protect the public, not the insurer, and that thus, the insurer cannot waive something designed to protect the public.[39] One commentary notes that as a general rule, "the social goal underlying the insurable interest requirement would be better served by allowing the estate of the insured to recover the proceeds of a policy issued without insurable interest than by continuing to allow that issue to be raised by the insurer as a defense."[40]

A few state courts have departed from the majority position and held that an estate has standing to challenge a beneficiary's right to retain insurance proceeds where the beneficiary lacked an insurable interest in the life of the deceased insured.[41] And in a number of states, the standing of an estate to sue for recovery of insurance proceeds from a beneficiary who lacked an insurable interest has been conferred by statute.[42] For example, South Dakota has statutes which provide that if a beneficiary lacking an insurable interest receives insurance benefits, "the individual insured or his executor or administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them."[43] And Oklahoma statutes provide "in substance that if anyone takes out a contract of insurance . . . on a person in whom it does not have an

---

[38] See 3 Plitt et al., *supra* note 36, § 41:7.

[39] *Id*. See, *Phillips v. Ins. Co.*, 60 Ohio St. 2d 180, 398 N.E.2d 564 (1979); *Farm Bur. Mut. Ins. Co. of Ark. v. Glover*, 2 Ark. App. 79, 616 S.W.2d 755 (1981).

[40] 28 Harnett & Lesnick, *supra* note 7, § 174.11 at 134.

[41] See, *Tamez v. Certain Underwriters at Lloyd's*, 999 S.W.2d 12 (Tex. App. 1998); *Smith v. Coleman*, 184 Va. 259, 35 S.E.2d 107 (1945); *Tate v. Building Ass'n.*, 97 Va. 74, 33 S.E. 382 (1899).

[42] 28 Harnett & Lesnick, *supra* note 7, § 174.10[B].

[43] S.D. Codified Laws § 58-10-5 (2004). See, also, S.D. Codified Laws § 58-10-3 (2004).

insurable interest, the insured or his representative may maintain a cause of action to recover the proceeds."[44]

We find some merit in the criticism of the rule established in *Ryan* and similar cases in other jurisdictions. But simply overruling *Ryan*, which has been the law in this state for more than 30 years, would not necessarily achieve legal clarity or an equitable result in all instances. For example, the liability of a beneficiary who obtains insurance proceeds in the good faith belief that an insurable interest existed may be different than the liability of one who achieves the same result through fraud or undue influence. In the former instance, recovery of the full amount of the policy proceeds by an estate may constitute a windfall, at least to the extent of premiums paid by the beneficiary. And, depending on the facts, there could be tension with a Nebraska statute which provides that "any money used as a bet or stake in gambling activity . . . shall be forfeited to the state."[45]

We conclude that the better course is not to overrule *Ryan*. We leave to the Legislature the policy questions of whether and under what circumstances an estate of an insured may recover insurance proceeds paid to a beneficiary who lacks an insurable interest in the life of the insured. Accordingly, we conclude that the district court did not err in dismissing the counterclaim.

## CONCLUSION

Although our reasoning differs from that of the district court, we conclude that it did not err in dismissing Johnson's claims and the estate's counterclaim. Accordingly, we affirm.

AFFIRMED.

WRIGHT, J., not participating.

---

[44] *Tillman ex rel. Estate v. Camelot Music*, 408 F.3d 1300, 1302 (10th Cir. 2005), citing Okla. Stat. Ann. tit. 36, §§ 3601 and 3604(B) (West 1999).

[45] Neb. Rev. Stat. § 28-1111 (Reissue 2008).