IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


COVIL V. COVIL


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STEPHEN RAY COVIL, APPELLEE AND CROSS-APPELLANT,

V.

KAREN COVIL, APPELLANT AND CROSS-APPELLEE.


Filed March 13, 2018.    No. A-17-203.


Appeal from the District Court for Lancaster County: JODI NELSON, Judge. Affirmed.

Bradley A. Sipp for appellant.

A. Bree Robbins, of Cordell & Cordell, L.L.P., for appellee.


PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## INTRODUCTION

Karen Covil appeals the Lancaster County District Court's order modifying Stephen Ray Covil's parenting time and awarding him a child support abatement (in consideration of transportation costs) during any month he exercises his parenting time. Karen also challenges the district court's decision to not hold Stephen accountable for past health insurance premiums or expert fees. Stephen cross-appeals the district court's decision to not modify previous Florida child support orders and to not admit certain bank records. We affirm.

## BACKGROUND

Karen and Stephen have three children, born in 2003, 2007, and 2008. The parties were divorced in Florida in May 2011, pursuant to a "Final Judgment of Dissolution of Marriage." At the time of that judgment, the children were temporarily living in Nebraska with Karen. The Florida order allowed the children to continue to reside with Karen in Nebraska until school was

- 1 -

dismissed for winter break in December, at which time Karen and the children would return to Florida. Stephen was ordered to pay child support in the amount of $200 per month, beginning on January 1, 2011; payments for "this year only" were to be made by Stephen directly to Karen. Stephen was ordered to provide health insurance for the children "through group coverage available to [him]" and he was to pay the premiums for such health insurance.

In an order filed on January 20, 2012, the Florida court allowed Karen to remain in Nebraska with the children until the completion of her schooling in May or June 2012. A parenting time schedule for Stephen was established for the interim, and he was to have the children for the entire summer break (with Karen having alternating weekends during that time). The court reserved the issue of a more permanent parenting plan for further determination at the end of the summer 2012. The court ordered Stephen to pay child support of $864 per month as child support. However, the court also reserved all other issues, including permanent child support, for a further determination.

An order from the Florida court filed in June 2013, notes that since June 2012, the minor children had primarily resided with Stephen in Florida.

The Florida court's order on "[Karen's] Motion for Temporary Timesharing" was filed on July 11, 2014. The court noted that: in July 2012, Karen filed a "Petition for Modification of Parenting and for Parental Relocation"; in March 2013 the court entered an order appointing Dr. Deborah Day to complete a social investigation and study; and in February 2014, Karen filed her motion for temporary timesharing. The court granted her motion for temporary timesharing, and established a "timesharing" plan through the 2014 "Winter Break." The court stated that "[r]etroactive child support back to the filing of [Karen's] Petition for Modification of Parenting and for Parental Relocation may be determined at final hearing."

On October 10, 2014, the Florida court filed its "Supplemental Final Judgment Granting Relocation." The court noted Karen had been unable to find employment in Florida and continued to reside in Nebraska, where she was employed as a high school teacher. The court granted Karen permission to relocate with the minor children to Nebraska, after finding that was in the children's best interests. Pursuant to the order, Stephen was to have parenting time with the children "one long weekend per month in Nebraska, associated with a Monday holiday, spring break, eight weeks in the summer, each Thanksgiving, and half of winter break[.]" The parties were to equally share in the transportation costs for the children. Stephen was ordered to pay child support in the amount of $879.04 per month through the Florida State Depository.

In a July 2015 order, the Florida court declined jurisdiction on Stephen's "Supplemental Petition for Modification of Parenting Plan and Child Support," finding that neither the children nor the parents presently resided in the state or had a significant connection to the state.

On January 8, 2016, Stephen filed a complaint for modification in the district court for Lancaster County seeking modification of parenting time. (It is undisputed that the Florida court's orders were properly registered in Nebraska.) He alleged that since the entry of the Florida order in October 2014, there had been a material and substantial change in circumstances (specifically that he had moved to Oklahoma and now lives closer to the children, and that the children are older) justifying a modification of parenting time. Additionally, Stephen alleged that Karen and the children lived with her "elderly parents," and the children are "forced to share one bedroom." He requested the court order Karen "to obtain appropriate housing for the minor children or in the

alternative grant [him] sole physical possession of the minor children" with permission to remove them to Oklahoma. In his amended complaint for modification filed on September 30, 2016, Stephen also asked the court to (1) determine what, if any, child support arrearage was owed by the parties, and (2) grant him a reduction in child support to offset travel costs for parenting times, when such costs are not equally shared by the parties.

Apparently both parties filed contempt actions against each other in January and February 2016, but neither the pleadings nor the subsequent orders to show cause appear in our record. However, both matters were heard the same day as the modification trial.

Trial on both orders to show cause and the modification was held on December 19, 2016. The district court found Karen in contempt for Stephen's missed parenting time with the children during Thanksgiving and Christmas 2015 when she refused to send the children by airplane. The district court determined there was not sufficient evidence to find Stephen in contempt for failure to pay child support (arrearage), failure to pay Dr. Day's expert fees, or failure to provide health insurance. The court's findings were noted in its modification order filed on January 18, 2017.

With regard to the modification of parenting time, the court found there had been a material change in circumstances warranting a modification of the Florida orders, namely that Karen had interfered with Stephen's parenting time "to include her unreasonable and unduly narrow interpretation of the court's prior order." The court also noted that Stephen had relocated to Oklahoma, which was "an eight hour drive" away from the children.

The court ordered that Stephen should have parenting time one weekend of his choice each month, so long as he gives Karen notice by the 21st day of the preceding month as to which weekend he will be exercising his parenting time. The weekend parenting time begins on Friday at 4 p.m. (or the conclusion of school, whichever is earlier), and concludes on Sunday at 6 p.m. (or 6 p.m. on Monday, if the weekend includes a Monday holiday). Stephen is also to have parenting time during the entirety of the children's Easter/Spring Break, Thanksgiving every year, half of the children's winter break, and 8 weeks each summer. Stephen is to be responsible for all transportation costs associated with exercising his parenting time, with the exception of two times in 2017 that Karen was ordered to pay for the children's air travel pursuant to the court's purge order (for contempt) on December 19, 2016.

The court found there had been a material change in circumstances warranting a modification of the child support in that the earnings of the parties had changed, and a Nebraska child support calculation was necessary now that Nebraska is the children's home state. Beginning January 1, 2017, Stephen was ordered to pay child support of $1,256 per month when there are three minor children, $1,113 per month when there are two minor children, and $818 per month when there is only one minor child. He was granted a $600 reduction in his child support obligation any month he exercises his parenting time in order to offset some of the transportation costs. The district court ordered Karen to continue to carry health insurance for the children as she had been. Stephen was to be responsible for 50-pecernt of all health-related expenses not covered by insurance that exceed $480 per child, per calendar year.

The district court overruled Stephen's requests to retroactively modify the Florida court's child support orders to give him credit, order Karen to pay child support, and to conduct some sort of accounting, because "the opportunity to correct any errors has long passed and should have been dealt with by [Stephen] while the case was under the jurisdiction of the Florida court."

Karen appeals, and Stephen cross-appeals.

## ASSIGNMENTS OF ERROR

Karen assigns, reordered, that the district court erred by (1) modifying Stephen's parenting time, (2) awarding Stephen a deviation in his child support obligation for his travel expenses, (3) not performing an accounting to reconcile amounts she had paid for health insurance that Stephen was ordered to provide but did not, and (4) not holding Stephen in contempt for his failure to pay fees as previously ordered, or in the alternative enter judgment against him for the same.

Stephen assigns on cross-appeal that the district court erred by (1) not modifying the Florida child support orders, and (2) not allowing exhibit 17 into evidence.

## STANDARD OF REVIEW

An appellate court reviews child custody determinations de novo on the record, but the trial court's decision will normally be upheld absent an abuse of discretion. *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015). An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

Parenting time determinations are also matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016).

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

Modification of child support payments is entrusted to the trial court's discretion, and although, on appeal, the issue is reviewed de novo on the record, we will affirm the trial court's decision absent an abuse of discretion. *Freeman v. Groskopf*, 286 Neb. 713, 838 N.W.2d 300 (2013). Whether a child support order should be retroactive is also entrusted to the discretion of the trial court, and we will affirm its decision absent an abuse of discretion. *Id.*

In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which (1) the trial court's resolution of issues of law is reviewed de novo, (2) the trial court's factual findings are reviewed for clear error, and (3) the trial court's determinations of whether a party is in contempt and of the sanction to be imposed are reviewed for abuse of discretion. *Hossaini v. Vaelizadeh*, 283 Neb. 369, 808 N.W.2d 867 (2012).

## ANALYSIS

*Parenting Time.*

Stephen testified he had previously been employed as an assistant store manager for a supermarket in Florida. However, he was laid off when the store closed, and he was unable to find another job in Florida or in Nebraska, where his children live. He was able to find a job at a food store in Oklahoma, and moved there in January 2015. He now lives closer to the children's home

in Lincoln, Nebraska, than he did when he resided in Florida. He testified that he now lives about 550 miles away from the children, a distance he can drive in a little more than 8 hours. In Florida, he lived 1,600 miles away from the children, which was a three-day driving trip or required flying.

Stephen testified he had been having issues with getting his parenting time with the children. For example, in September 2015, he emailed Karen to find out what weekend he could see the children. She said that he could have any weekend except for Labor Day weekend (the only weekend associated with a Monday holiday); so he chose another weekend and came to see the children in Nebraska. Then in October, Stephen emailed Karen about coming to see the children the weekend of Halloween, and she said no, because it was not associated with a Monday holiday. He said there were no Monday holidays in October, and he "doubt[ed] that the intent of the parenting plan was to deny [him] visitation in any given month." In November, Karen "refused" to put the children on an airplane because she said they were too young, even though pursuant to the court order he was supposed to have them for Thanksgiving break. In December, Karen again said she was not going to put the children on an airplane, citing their ages. Karen testified that she did not agree to have the children travel by airplane, and had asked Stephen to mediate the issue. She wanted contingencies in place in case the airplane was diverted, but said Stephen "didn't seem to care about those concerns." She testified that she told Stephen he was welcome to come to Nebraska to see the children that Christmas.

Stephen was able to get his parenting time during the 2016 spring break, but only after seeking the Nebraska court's help. Karen testified she did send the children on an airplane for that trip, and "they were all pretty nervous," but "[t]hey made it there and back okay." Stephen said he again had difficulty getting his parenting time in October 2016. Exhibit 14, emails between the parties, was received into evidence without objection. In the emails, Stephen tried to arrange parenting time for the children's fall break and for Halloween in 2016. Karen responded by stating that he did "not have visitation time in October or at Fall Break." In the emails, Karen made clear her position that based on her reading of the court orders, Stephen did not get parenting time with the children every month, rather, he only got parenting time if there was an "extended weekend," in other words, "a long weekend associated with a Monday holiday."

Stephen also testified that he had trouble getting his court-ordered telephone contact with the children. He said "I called . . . multiple times and my calls are not returned. . . . This year alone there've been about 35 phone calls [on different days] not returned that I've made to the children." According to Stephen, he tried to text Karen, but she would either not respond or would give excuses about why the children could not call him back.

Karen testified that the Florida court's October 2014 order relied strongly on the findings of Dr. Day, who set out a "very set visitation schedule to provide . . . consistency and calmness to the childrens' [sic] daily schedule. And also, . . . so that they would know when their father was coming and to minimize as much stress as possible . . . for them." The October 2014 order states that Dr. Day recommended Stephen be awarded "timesharing one long weekend per month in Nebraska, associated with a Monday holiday, spring break, eight weeks in the summer, each Thanksgiving and half of winter break to be rotated first and second half of each year"; and this is the parenting time schedule that the Florida court ordered. Karen said that schedule has "worked beautifully." According to Karen, in 2015 Stephen missed three or four parenting times in

Nebraska, and in 2016, he has "come out, but he hasn't stayed for, like, entire weekends." (Stephen testified he had trouble exercising parenting time on long weekends because he works in retail.)

In its order, the district court for Lancaster County found there had been a material change in circumstances warranting a modification of the Florida orders. In addition to noting that Stephen had relocated to Oklahoma, which was "an eight hour drive" away from the children, "of significance to the court" was Karen's interference with Stephen's parenting time. The court said her interference included

> her unreasonable and unduly narrow interpretation of the [Florida] court's prior order, including but not limited to the limits she has imposed on the children traveling by air as unaccompanied minors (unless she agrees and is "comfortable" with this manner of transportation it cannot occur), her unwillingness to drive half-way, and her belief that if a month does not contain a Monday holiday, [Stephen] is entitled to no parenting time.

The court said "it is clear that [Karen] sees herself as the sole arbiter of disputes between the parties." The court granted Stephen parenting time as previously set forth.

Karen argues the district court erred in finding there had been a material change of circumstances warranting a modification of parenting time. More specifically, she states that "the Florida Court relied heavily on the findings of Dr. Deborah Day in fashioning a parenting plan that was in the best interests of the minor children," and that "the [Nebraska] court gives little to no deference to the Florida Court's findings and modifies the parenting plan the parties are ordered to follow without a material change of circumstances ever occurring." Brief for appellant at 12. She claims that neither Stephen's move to Oklahoma nor the children getting older constitute a material change in circumstances because "[b]oth of these events could be foreseen by the Florida court at the time of the entry of the Decree as Stephen was unemployed at that time and could therefore seek work anywhere in the country he chose to." *Id*. at 13.

The best interests of the children are the primary and paramount considerations in determining and modifying parenting time. *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016). The right of parenting time is subject to continuous review by the court, and a party may seek modification of a parenting time order on the grounds that there has been a material change in circumstances. *Id*. A material change in circumstances means the occurrence of something which, had it been known at the time of the initial decree, would have persuaded the court to decree differently. *State on behalf of Slingsby v. Slingsby*, 25 Neb. App. 239, 903 N.W.2d 491 (2017).

We note that the only difference in parenting time from the October 2014 Florida order, which was recommended by Dr. Day, is that the current modification order clearly states that Stephen is to have parenting time one weekend per month in Nebraska, and it does not need to coincide with a Monday holiday. To the extent that this was a modification, rather than a simple clarification, the record before us reveals no abuse of discretion by the district court. On this issue, the order states, "[O]f significance to the court" was Karen's interference with Stephen's parenting time. And a parent's interference with the other parent's parenting time can be a material change in circumstances sufficient to alter a parenting plan. *Kamal v. Imroz*, 277 Neb. 116, 759 N.W.2d 914 (2009) (dissolution action making initial custody determination; stating interference with other parent's visitation rights can arise to a material change in circumstances sufficient to alter a

parenting plan, but there was no indication at present that mother would ignore trial court's order). Based on the evidence, the court's findings, and the foregoing legal principles, we see no abuse of discretion by the district court in modifying the parenting plan.

*Deviation for Travel Expenses.*

At trial, Stephen asked the court for a deviation in child support because he has the children full-time for 2 months in the summer, and he incurs travel expenses 7 months of the year when he travels to Nebraska to spend a weekend with them. He said that in the past he has had trouble getting Karen to reimburse him for her half of the travel expenses. Karen testified that she was supposed to pay one-half of the travel expenses for holidays, and admitted that she had not reimbursed Stephen; apparently because she believed Stephen owed her for other expenses like Dr. Day and the monthly health insurance.

Stephen had asked that Karen meet him in Wichita, Kansas, for transportation of the children. However, Karen testified that the prospect of a long trip makes her feel "uneasy," "especially traveling by [herself] with the weather conditions and with the children." In the past 2 years, the furthest Karen had driven was from Lincoln to Omaha, Nebraska. Karen said she also had concerns that there would be problems exchanging the children with Stephen, for example, that he would leave the meeting site if she was not on time or that there would be behavior problems.

According to Stephen, it is 1,128 miles round trip from his home in Oklahoma to the children's home in Nebraska. Using the IRS' "standard mileage deduction" of 54 cents per mile, he calculated 7 round trips per year would cost him $4,263.84 annually; this is $609.12 per trip, or $355.32 per month if divided over 12 months. That amount did not include hotels, which he estimated were an additional $100 per night, for an average of 2 nights per trip. His calculation, including a "mapquest" print out for mileage and an IRS printout for the 2016 standard mileage rates, were received without objection as exhibit 26. He testified that one-half of travel costs for the three children was $1,641.60 for Christmas 2015, and $1,445.47 for spring break 2016; this included air fare and "the difference in mileage" for both parties to drive to the airport (to get direct flights, the closest airport for him was in Dallas, Texas, and for Karen it was in Omaha).

The district court said it was "certain that without modification regarding travel for [Stephen's] parenting time and the associated expenses, Karen will continue to make decisions that interfere with [Stephen] exercising his parenting time." The court said that "the mode of travel for [Stephen] to exercise parenting time, i.e., by air or car, shall be at the sole discretion of [Stephen]." With two exceptions in 2017, the court ordered Stephen to be responsible for all costs associated with exercising his parenting time. However, the court gave Stephen a $600 reduction in his child support in any month he exercises parenting time as ordered. The court arrived at the amount of the credit by noting that the distance between the parties was approximately 550 miles, and "conservatively using fifty cents per mile as the cost of this travel by car, a round-trip would cost [Stephen] $550," which "does not account for meals or hotel expenses that [he] would incur in exercising his parenting time in Lincoln[.]" The court noted that the expense to fly the three children was even higher. The court said this "direct credit" was intended to "reduce the conflict between the parties associated with sharing the expense of travel so that [Stephen's] parenting time and ability to exercise it will no longer be impacted by decisions of [Karen]." "The credit shall be

afforded to [Stephen] by [Karen] executing and filing with the Clerk of the District Court a notarized receipt in the amount of $600 before the last business day of the month in which [Stephen] exercised his visitation." Karen cannot reduce or alter the amount for any reason without Stephen's express and written consent, which must be filed along with a receipt for less than the full $600.

Karen argues that "[o]nly reasonable transportation expenses may reduce or abate a child support obligations" and that "[a]llowing unlimited abatement of child support, to the point where the custodial parent receives substantially reduced or no child support, is contrary to the children's best interests." Brief for appellant at 11. She argues "[t]he reality in this case is that [she] is now ordered to provide health insurance for the minor children at a cost of $283.70 per month" and "[o]nce health insurance and Stephen's abatement are factored in, it leaves [her] financially strapped to care for the children." *Id*. at 11-12. She asks this court to find that Stephen should not get an abatement of his child support obligation for travel expenses because the "[t]he record is clear that Stephen earns more than enough to pay for his travel . . . in order to exercise his parenting time." *Id*. at 12.

Generally, child support payments should be set according to the Nebraska Child Support Guidelines, which are applied as a rebuttable presumption. *Freeman v. Groskopf,* 286 Neb. 713, 838 N.W.2d 300 (2013); Neb. Ct. R. § 4-203 (rev. 2011). A deviation in the amount of child support is allowed whenever the application of the guidelines in an individual case would be unjust or inappropriate. *Pearson v. Pearson*, 285 Neb. 686, 828 N.W.2d 760 (2013). Deviations from the guidelines must take into consideration the best interests of the child. *Id*.; § 4-203.

The guidelines specifically address the type of deviation at issue. Neb. Ct. R. § 4-210 (rev. 2008) provides that "[a]ny documented substantial and reasonable long-distance transportation costs directly associated with visitation or parenting time may be considered by the court and, if appropriate, allowed as a deviation from the [child support] guidelines." Only reasonable transportation expenses may reduce or abate a child support obligation. *Pearson v. Pearson, supra* (lower court terminated father's child support obligation in recognition of greatly increased costs he would incur to exercise parenting time with his children who moved to Alaska with mother; because lower court did not include a child support worksheet cause remanded back to lower court which was to consider impact of increased transportation expenses on both parents in light of best interests of the children). Allowing unlimited abatement of child support, to the point where the custodial parent receives substantially reduced or no child support, is contrary to the children's best interests. *Id*. A custodial parent has some fixed and constant expenses in raising children, and these expenses do not decrease simply because transportation costs significantly increase. *Id*.

This case is distinguishable from *Pearson v. Pearson, supra*, because Stephen's child support obligation was not terminated. Additionally, the district court included a child support worksheet and explained its reasons for deviating from the guidelines.

Karen admitted that she failed to reimburse Stephen for any travel expenses, even though the parties were to equally share in the transportation costs for the children. She was also unwilling to meet Stephen half-way for parenting time exchanges, which would have equalized the costs for both parties. The district court's decision to eliminate the reimbursement problem by addressing transportation costs in this manner was not an abuse of discretion.

Karen claims that the combination of the travel cost abatement and health insurance costs leave her "financially strapped" to care for the children. However, as will be discussed below, the health insurance issue is one of her own making; and her payment of the children's health insurance premium was accounted for in the child support worksheet. Further, according to the child support worksheet attached to the decree, both parties have a similar monthly income, and neither party challenges the income attributed to them. Although Karen claims "[t]he record is clear that Stephen earns more than enough to pay for his travel . . . in order to exercise his parenting time," brief for appellee at 12, there is no evidence in the record that she is finically unable to absorb some of those costs as well.

*Health Insurance.*

Karen asserts that the district court erred by not performing an accounting to reconcile amounts she had paid for health insurance that Stephen was ordered to provide but did not. She cites to *Smeal Fire Apparatus Co. v. Kreikemeier*, 279 Neb. 661, 782 N.W.2d 848 (2010), *overruled in part on other grounds, Hossaini v. Vaelizadeh*, 283 Neb. 369, 808 N.W.2d 867 (2012), for the position that "[c]ompensatory relief is remedial and is not prohibited in civil contempt proceedings as long as it is limited to complainant's actual losses." Brief for appellant at 15.

Although Karen's contempt pleading does not appear in our record, the district court's order states that Karen alleged the following: "On October 9, 2014, [Stephen] was ordered to provide health insurance for the minor children and [he] has failed to do so."

Pursuant to the Florida court's May 2011 order, Stephen was to provide health insurance for the children through group coverage available to him, and was to pay the premiums for that health insurance. The Florida court's October 2014 order simply said Stephen was to provide health insurance for the minor children.

Stephen testified he did not provide health insurance for the children in 2015 or 2016, but insurance was available through his employer. He said that when he took his job in Oklahoma, his health insurance changed due to having a new employer. He emailed Karen in January 2015, to let her know about the change and what the benefits were going to be. Stephen said Karen did not want his insurance because it was not based in Nebraska; but his previous insurance was not based in Nebraska either, it was based in Florida. He received an email from her stating that she put the children on her insurance. He said he asked her what the monthly cost was, but she never responded.

Exhibit 16, emails between the parties, was received into evidence without objection. In the emails, on January 22, 2015, Karen wrote, "The children are covered under my insurance now and I will seek to have this changed given the events of the past." And on February 14, Karen wrote in relevant part,

> I do not agree for you to carry the children's insurance through your current employer. As you will from [sic] the judgment, you are to provide the health insurance but it does states [sic] that it should be through your employer. **I will not and do not agree to an out-of-state policy or one through your employer, which will cause all of the children's medical claims to be out of network in Nebraska.** You will need to secure a Nebraska policy for them if you ever intend to honor this agreement. Further, all deductible

levels/coverage must be discussed with me and agreed upon prior to obtaining this insurance.

(Emphasis in original.)

Karen testified that Stephen could have still provided health insurance, and that they would have had "a primary and secondary insurance situation."

When a party to an action fails to comply with a court order made for the benefit of the opposing party, such an act is ordinarily a civil contempt, which requires willful disobedience as an essential element. *Hossaini v. Vaelizadeh, supra.* " 'Willful' means the violation was committed intentionally, with knowledge that the act violated the court order." *Id.* at 376, 808 N.W.2d at 873.

At the conclusion of trial, the court found that Stephen had previously carried health insurance through his Florida employer, but that when he notified Karen that he had a new job in Oklahoma, "she specifically told him not to put the children on that policy" and that "he was either to let her put the children on her policy or that he was to get a Nebraska policy." However, "[t]here's nothing in the order that required [Stephen] to get a Nebraska policy." "So, to suggest that [Stephen] is somehow in contempt by [Karen's] standards . . . for not providing health insurance, when she, one, told him not to; and two, alleged to him that it was his responsibility to provide a Nebraska policy is simply not . . . born out by the orders of the Court."

In its written order, the court found Karen's position on the issue of health insurance "completely and entirely unreasonable" and said it could not find Stephen in contempt for failing to carry the children on his health insurance. The court further "decline[d]" to order Stephen to reimburse Karen for any premiums she incurred since she began carrying the health insurance "as she chose to do." The court noted that Karen never responded to Stephen's inquiry with regard to the premium expenses, and that "[i]t is completely disingenuous for her to now demand that he pay thousands of dollars as reimbursement for sums she was unwilling to tell him the cost of when he inquired." Based on our de novo review of the record, we find no abuse of discretion in this aspect of the district court's order. Nor did the district court abuse its discretion when it did not require Stephen to reimburse Karen for the children's health insurance premiums that she paid.

*Contempt.*

Karen asserts that the district court erred by not holding Stephen in contempt for his failure to pay fees for Dr. Day as previously ordered, or in the alternative enter judgment against him for the same.

Although Karen's contempt pleading does not appear in our record, the district court's order states that Karen alleged the following:

"On March 12, 2013, [Stephen] was ordered to pay one-half the costs of an Expert for Social Investigation and Study by Dr. Deborah Day." [Karen] claims she paid the full amount, $26,400, and that [Stephen] has refused to reimburse her for his share. She asks that he be found in contempt for his failure to pay.

At trial, Stephen testified that there was an order that the costs for Dr. Day were to be split, and that the provider was to be paid directly. However, when he contacted Dr. Day's office he

found out that the bill had been paid in full. Karen testified that she, with help from her parents, paid Dr. Day's bill of $26,473.75.

At the conclusion of trial, the court acknowledged the discussion and testimony of the parties that there was some order, but "specifics of what [Stephen] may or may not have been ordered to pay simply aren't before the Court." In its written order, the court said it had gone through all of the evidence received at the hearing, but "[n]owhere in the evidence is there an order dated March 12, 2013. Nor is there an order anywhere in the evidence requiring [Stephen] to pay costs associated with Dr. Deborah Day." The court determined that without such an order, it could not find Stephen in contempt. Furthermore, "without such an order, the court cannot and will not enter an order directing [Stephen] to pay some unknown amount as a judgment relating to whatever the costs associated with Dr. Day may have been."

In her brief, Karen concedes that no order was produced requiring Stephen to pay for any of Dr. Day's fees, but she points to Stephen's testimony where he admitted such an order existed and that he had not complied with that order. However, we cannot say that the district court abused its discretion by not finding Stephen in contempt for failing to pay fees for Dr. Day, especially in light of the evidence that Stephen understood payments were to be made directly to Dr. Day, and that he contacted Dr. Day's office only to learn that the bill had been paid. Nor can we say that the district court abused its discretion by not entering a judgment against Stephen for the same.

*Cross-Appeal.*

Stephen asserts that the district court erred by not retroactively modifying the Florida child support orders. More specifically, he argues the district court erred in failing to correct an alleged error in a 2012 Florida order regarding when his increased child support obligation was supposed to begin. He also argues the district court failed to determine the actual child support arrears owed by the parties from Florida. He further argues the district court erred in failing to give him a credit for amounts of child support he paid to Karen directly, or in the alternative to give him a credit for the amounts she would owe in child support for the 27 months the children lived with him in Florida from June 2012 through mid-October 2014.

Pursuant to the Florida court's May 2011 order, Stephen was to pay child support in the amount of $200 per month, beginning in January of that year; payments for "this year only" were to be made by Stephen directly to Karen. Stephen testified he had paid all child support due under that order, all the way through December 2011.

In its January 2012 order, the Florida court increased Stephen's child support obligation to $864 per month. The order states:

> [Stephen] shall, beginning *January 1, 2011*, and continuing on the first day of each and every month, pay to [Karen] the sum of $864.00 as child support. Child support shall be paid through the Collier County Clerk of Courts, Support Division, together with the applicable Clerk's fee. The *January payment shall be made* directly to [Karen] when the children are returned to her *on January 7, 2012. . . .*

(Emphasis supplied.) Stephen testified that the January 2012 order contains a typo, and that the support payments of $864 per month were supposed to start in January 2012, not 2011 as stated in the order. And even though the order says he should pay the support through the "Collier County

Clerk of Courts, Support Division," Stephen testified he had always paid Karen directly, so he continued to pay Karen directly and "she received those checks." According to Karen's testimony, she did not believe that she received all of the payments Stephen testified to for 2011 and 2012.

The Florida court's June 2013 order notes that the children had resided with Stephen in Florida since June 2012. It appears from the Florida court's July 2014 order that the children were still in Florida with Stephen, subject to Karen's timesharing. That order also states that "[r]etroactive child support back to the filing of the Former Wife's Petition for Modification of Parenting and for Parental Relocation may be determined at final hearing." Stephen testified that the children lived with him in Florida from June 2012 until mid-October 2014. He further testified that his child support was "abated" during the 27 months that the children lived with him. Exhibit 7, the certified transaction history from Florida, showing no assessments against him after June 2012 until October 2014, supports his testimony. The Florida court's October 2014 "Supplemental Final Judgment Granting Relocation" granted Karen permission to relocate the children to Nebraska, and ordered Stephen to pay child support of $879.04 per month through the "Florida State Depository." But the October 2014 order did not address "retroactive child support," even though its previous orders stated that it could be addressed at a final hearing. And in a July 2015 order, the Florida court declined jurisdiction on Stephen's "Supplemental Petition for Modification of Parenting Plan and Child Support," finding that neither the children nor the parents presently resided in the state or had a significant connection to the State.

Stephen testified he was not awarded any retroactive child support for the time he had the children. He further testified that none of the arrearage issues were resolved. Because Florida stated it did not have jurisdiction, Stephen asked the Lancaster County District Court to address the child support issues, including giving him credit for the direct payments he made to Karen through July 2012, claiming it was the only court that had jurisdiction to determine the issues. His counsel argued that retroactive support for the 27 months he had the children "would do away with any arrearage" and there might even be amounts owed to Stephen.

Exhibit 7 also shows that as of October 19, 2015, Stephen's balance due for child support was $17,925.90. It shows child support of $864 per month was assessed for all of 2011. After the December 2011 assessment, Stephen's balance due was $10,368, which is the sum total of $864 per month over the course of 12 months. This goes to Stephen's argument that there was a typo in the Florida court's January 2012 order, and that the $864 wasn't supposed to start until 2012. He says in 2011 his support was $200 per month. And that he paid all of that support directly to Karen.

At trial, Karen agreed that the Florida court never addressed the arrearage that might be owing for child support, and that the child support issue needs to be addressed.

In the modification order, the district court noted an inconsistency in the Florida court's January 2012 order, regarding when support payments were to begin. However, the court said, "It is clear from the evidence presented that the opportunity to correct any errors has long passed and should have been dealt with by [Stephen] while the case was under the jurisdiction of the Florida court." The court found that Stephen's argument that the issues of child support were unresolved by the Florida court was without merit. The court said the July 2014 order of the Florida court specifically found that retroactive support could be determined at the final hearing. The final order was filed by the Florida court in October 2014 and "[w]hile there are no provisions relating to any retroactive child support, it is clear that those issues could have been addressed by the court at that

time." The district court overruled Stephen's request to retroactively modify the Florida court's child support orders to give him credit, order Karen to pay child support, and to conduct some sort of accounting.

In his brief on cross-appeal, Stephen argues the district court erred by not correcting the Florida court's January 2012 order, by not accounting for payments made directly to Karen, and by not awarding him child support for the 27 months he had custody of the children in Florida (and offsetting that amount by the arrears owed in Florida). He further argues that because Florida declined jurisdiction in its July 2015 order, Nebraska obtained jurisdiction to modify the child support orders from Florida.

In her reply brief, Karen asserts, "Nothing in Nebraska Law would allow for the final Florida Orders to be retroactively amended. There is no law to cite that would allow the [Nebraska] Court to modify the Florida Orders." Reply brief of appellant at 6. She claims that Stephen had the opportunity to raise the issue in Florida and did not.

We, like Karen, have found nothing in Nebraska law that would allow for the final orders from Florida to be retroactively amended. As noted by the district court, "[w]hile there are no provisions [in the October 2014 Florida order] relating to any retroactive child support, it is clear that those issues could have been addressed by the court at that time." Further, as noted by the district court, "the opportunity to correct any errors has long passed and should have been dealt with by [Stephen] while the case was under the jurisdiction of the Florida court." We find no abuse of discretion in the district court's decision to overrule Stephen's request to retroactively modify the Florida court's child support orders to give him credit, order Karen to pay child support, and to conduct some sort of accounting.

Based on our disposition above, we need not address Stephen's argument that the district court erred by not receiving exhibit 17 (alleged bank records showing payments he made to Karen in 2011 and 2012) into evidence. *Johnson v. Nelson*, 290 Neb. 703, 861 N.W.2d 705 (2015) (appellate court not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it). However, for the sake of completeness, we note that Stephen was allowed to testify to such payments and therefore was not prejudiced by any alleged erroneous exclusion of exhibit 17. *Sturzenegger v. Father Flanagan's Boys' Home*, 276 Neb. 327, 754 N.W.2d 406 (2008) (erroneous exclusion of evidence is reversible only if complaining litigant was prejudiced by exclusion of such evidence; an improper exclusion of evidence is ordinarily not prejudicial where substantially similar evidence is admitted without objection). Any payments made to Karen in 2011 and 2012, would go to the arrearage noted in exhibit 7, the certified transaction history from Florida, which the Nebraska courts have no authority to adjust.

CONCLUSION

For the reasons stated above, we affirm the decision of the district court.

AFFIRMED.